COMMONWEALTH *vs.* CHIMEZIE AKARA

(and seventeen companion cases[1]).

Suffolk. January 11, 2013. - May 21, 2013.

Present: SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Joint Enterprise. Accessory and Principal. Armed Assault with*
*Intent to Murder. Assault and Battery by Means of a Dangerous Weapon.*
*Firearms. Evidence,* Joint venturer, Relevancy and materiality, Bias, State-
ment of codefendant. *Witness,* Bias. *Practice, Criminal,* Trial of indict-
ments together, Instructions to jury, Argument by prosecutor, Comment by
codefendant's counsel, Argument by counsel, Capital case, Confrontation
of witnesses. *Constitutional Law,* Confrontation of witnesses.

At a murder trial in which the Commonwealth proceeded on a theory of joint
venture, the evidence, viewed in the light most favorable to the Com-
monwealth, was sufficient to permit the jury to conclude beyond a reason-
able doubt that each of two codefendants, although not the shooter of the
victim, participated in and shared the requisite intent to commit the crime.
[253-256]
Whatever prejudice resulted from the joint trial of indictments charging the
two codefendants with, inter alia, murder in the first degree was not so
compelling that it prevented the defendants from obtaining a fair trial,
where the jury could easily have relied on considerable independent evidence
other than the inculpatory suggestions of one defendant against the other to
conclude that both defendants were guilty of the charged offenses. [256-258]
At a murder trial involving two defendants, the judge properly instructed the
jury on joint venture and was not required to give an instruction exactly as
requested by the defendants [258]; further, the judge did not err in instruct-
ing the jury on murder in the first degree on a theory of extreme atrocity
or cruelty [258-260], and his instructions properly directed the jury to
consider any potential bias, while preventing the jury from reaching a
"results-oriented verdict" based on their knowledge of the possible sentence
[260-261].
At a murder trial involving two defendants, although the prosecutor in closing
argument improperly suggested that the existence of an indictment was
evidence of guilt, the remark could not have made a difference in the
jury's conclusions, where the judge's charge to the jury following closing
argument responded to the prosecutor's improper argument [261-262];
further, no prejudice to one nontestifying defendant arose from closing
argument by the other defendant's counsel, where counsel's reference to
his client's "courage" in testifying and facing cross-examination was not

[1]Eight against Chimezie Akara and nine against Andre Green.

improper, where the jury would have understood counsel's improper vouching for the credibility of particular witnesses as zealous advocacy, and where counsel's improper inflaming of the jury's passions was unlikely to have affected the jury's verdicts, given the strong evidence of each defendant's guilt [263-265].

At a murder trial involving two defendants, no confrontation issue arose from the admission in evidence of a statement made by one defendant that implicated only himself [265-266]; further, limited evidence of gang affiliation was relevant to supply additional evidence of the defendants' relationship, which supported the Commonwealth's case for joint venture [266-269].

INDICTMENTS found and returned in the Superior Court Department on December 5, 2003.

The cases were tried before *Thomas E. Connolly*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for Andre Green.

*Kevin S. Nixon* for Chimezie Akara.

*Kathleen Celio*, Assistant District Attorney (*Sarah H. Montgomery*, Assistant District Attorney, with her) for the Commonwealth.

DUFFLY, J. Shortly before 8 P.M. on the evening of February 5, 2003, Philip Gadsden, who was traveling on a Massachusetts Bay Transportation Authority (MBTA) subway train, was threatened with a gun by one of two passengers standing together in the aisle. While the train was pulling into the Massachusetts Avenue MBTA station, Gadsden moved down the car away from the man pointing the gun and yelled to other passengers that there was a gun on the train. As the passengers rushed out of the train, two shots were fired in Gadsden's direction. One bullet lodged in a guitar case that was being carried over the shoulder of a fleeing passenger. The second bullet pierced the abdomen of a female passenger, Hawa Barry, who was thirty-six weeks pregnant. The bullet passed through her unborn child, who was born alive before succumbing to his injuries.

The defendants, Chimezie Akara and Andre Green, were indicted for murder in the first degree and other related assault and firearms offenses several months after the shootings, based on videotape surveillance images from cameras at two MBTA subway stations, interviews with Gadsden and more than a dozen passengers on the train, and statements by witnesses who

spent time with the defendants both before and after the shootings. The Commonwealth's theory at trial was that the shootings had been committed as part of a joint venture in which one of the defendants had fired the gun intending to shoot Gadsden, and the other had acted as a joint venturer in the commission of the crime.

Arguing that the evidence of joint venture was insufficient, the defendants moved for required findings of not guilty on all of the indictments. These motions were denied.[2] A Superior Court jury convicted each defendant of murder in the first degree on a theory of extreme atrocity or cruelty.[3] Each defendant also was convicted of assault by means of a dangerous weapon, three counts of armed assault with intent to murder, two counts of assault and battery by means of a dangerous weapon, possession of a firearm without a license, and possession of ammunition without a firearm identification card.

On appeal, both defendants argue that there was insufficient evidence of joint venture; their trials should have been severed; the instructions on joint venture were erroneous; the prosecutor's closing argument was prejudicial in several respects; and evidence of the defendants' gang affiliation should not have been admitted. Akara argues also that the judge's instruction on murder in the first degree on a theory of extreme atrocity or cruelty was erroneous; the judge improperly prevented the jury from considering Green's motive to lie; and Green's closing argument was improper and prejudiced Akara. Green argues that the admission of certain statements by Akara violated the rule set forth in *Bruton* v. *United States*, 391 U.S. 123, 137 (1968). We affirm the defendants' convictions and conclude that there is no basis on which to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

1. *Facts.* We recite the facts the jury could have found in the light most favorable to the Commonwealth, see *Commonwealth*

[2]The judge allowed the defendants' motions for required findings of not guilty as to a charge of possession of a .38 caliber firearm without a firearm identification card. The bullets fired came from a nine millimeter handgun, and there was no evidence of a second gun at the scene.

[3]The jury did not find either defendant guilty of murder in the first degree on theories of deliberate premeditation or felony-murder.

v. *Latimore*, 378 Mass. 671, 676-677 (1979), reserving certain details for our discussion of specific issues.

On February 5, 2003, Akara, Green, and their friends Sean Brown and Burrell Ramsey-White spent time together at the home of another friend, Kalif Christopher, in the Mattapan section of Boston. From there, Akara, Green, Brown and Ramsey-White traveled to the Forest Hills MBTA station, where they congregated near the doughnut shop on the upper floor. Akara was the only member of the group wearing a baseball cap; a logo on the cap showed the letters "TC" interlocked.[4] He also wore a dark jacket with a hood. Green, the shorter of the two defendants, was wearing a dark sweatshirt with a pointed hood. While waiting for the train, one of the four wrote "Tent City" and "TC" in green marker on an MBTA sign.

Sometime between 7:40 P.M. and 7:50 P.M., the four boarded an Orange Line train car numbered 1205 at the rearmost door, identified at trial as door number three. They stood in two groups, with Green and Akara standing together near the door on the platform side of the car and Brown and Ramsey-White standing together across the aisle. Gadsden boarded the same train and sat near the rear door, close to where Akara and Green were standing.

None of the passengers on the train saw the events leading up to the shooting, or the shooting itself, in its entirety, but much of the passengers' testimony was overlapping. A college student, who was sitting in the middle of the car with two friends, saw a group of young African-American men board the train. One of the men (Gadsden), who was somewhat older than the others, sat across from the student, while the four other men remained standing in groups of two. While waiting for the train to leave the station, the student saw the seated passenger, with his elbows on his knees, "throwing glances" at the individuals on both sides of him, and "nodding" in a "yes" motion to the two men standing near him to his right (Akara and Green). None of the five men spoke, and the student thought the situation seemed

[4]Testimony by a police expert and Green's girl friend, as well as certain statements by Green, established that the defendants were members of a small and loosely-organized gang known as Tent City, whose logo was an interlocking "TC," referencing the Minnesota Twins baseball team.

tense. The taller of the two men standing to Gadsden's right (Akara) had his hand in his pocket. The student thought that the man with his hand in his pocket might have a weapon. She and her friends left car 1205 and boarded a different car on the same train.

A few stops later, as the train left the Ruggles station for the approximately one-minute ride to the Massachusetts Avenue station, another passenger heard a "very loud, tense verbal exchange" between the seated man (Gadsden) and the two men standing near him to Gadsden's right (Akara and Green). At that time, Gadsden saw that one of the defendants was holding a gun at his side.[5] Both defendants were looking in Gadsden's direction. Another passenger saw one of two young men standing together near the rear door raise his arm and point it in Gadsden's direction; both were wearing hooded sweatshirts, and the one who was pointing towards Gadsden (Akara) was wearing a baseball cap. The passenger was unable to see what the man who was pointing was holding in his hand, because his view was blocked.

Gadsden got up from his seat and started walking to the front of the train, waving his arms and yelling, "there's a gun on the train" and "they have a gun," while pointing to the defendants. He exhorted passengers to get down, to "stay back," to "move to the other side," and to "get off the train."

When the doors opened at the Massachusetts Avenue subway station, passengers who had moved to stand near the first and second doors began running from the train. The defendants also got off the train. A passenger still inside car 1205, as well as

---

[5]The jury heard evidence that, in June, 2003, Gadsden met with police. At that time, Gadsden described the person he saw with the gun as an African-American male wearing a black hooded coat and a baseball cap, consistent with the clothes that Akara had been wearing that evening. The judge allowed this testimony to be admitted substantively as identification evidence. See *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 436-437 (2005). When Gadsden testified before the grand jury, however, he was unable to recall which of the defendants was holding the gun. At trial, Gadsden testified to having no memory of the events on the train. Concluding that his lack of memory was feigned, the judge also allowed Gadsden's grand jury testimony to be admitted substantively. See *Commonwealth* v. *Sineiro*, 432 Mass. 735, 745 (2000); *Commonwealth* v. *Daye*, 393 Mass. 55, 75 (1984).

passengers on the platform, heard pops or gunshots coming from the rear of the car, near door number three.

A passenger in a car behind car 1205 heard several loud bangs coming from the front of the train, followed by shouts and screams from the same direction. Ten seconds later, he saw a "pack" of four or five individuals running furiously, coming from the direction of the commotion and heading towards the exit at the rear of the station. They ran close together, in a group; all were wearing dark baggy clothes and at least one had on a gray hooded sweatshirt.[6] The passenger heard the men laughing or chuckling, in a congratulatory manner, as though one had "scor[ed] a goal or made a basket." Another passenger saw a group of four young males running towards the exit. He observed the tallest member of the group (Akara) holding his waist, as if gripping something near his belt. A security camera on a nearby parking garage captured images of four men running from the station and through a parking lot.

Two shell casings were found on the platform. One bullet ricocheted off the outside of car 1205, between doors two and three, and pierced a guitar case carried by music student Aldofredo Pulido, who was running from the train with the guitar case over his right shoulder. It was not until Pulido reached his classroom that he opened the guitar case and discovered his damaged guitar and the bullet inside the case.

A passenger heard a scream, turned, and saw a woman (Barry), holding the left side of her abdomen. Blood was flowing between Barry's fingers, and there was a lot of blood on the floor. Barry, who was then thirty-six weeks pregnant, was a recent immigrant to the United States and was unable to speak or understand English. She had seen Gadsden walking up and down the aisle of the train waving his arms, but could not understand what he was saying. When the train came to a stop and passengers were getting off, a man tried to lead her through the middle door. Barry had taken just one step through the door when she heard a "pop pop"; she felt a pain in her stomach, saw that her stomach was covered in blood, stepped back into the train, and sat down. Gadsden, who had preceded Barry out

---

[6]Surveillance videotape images showed the defendants and Ramsey-White wearing dark clothes; Brown was wearing a lighter colored sweatshirt.

the middle door, got back onto the train when he heard the second shot. He and others assisted Barry to a bench on the platform; Gadsden then got on the next train.

Barry was rushed to a hospital, where her son was born alive by cesarean section at 8:43 P.M. He had severe internal bleeding and organ damage from the bullet that had traveled through his body and exited the right side of Barry's abdomen; he died of his injuries forty-five minutes later. Emergency surgery was performed on Barry, who survived.

At approximately 8:15 P.M., Akara and Green returned to the apartment where Green lived with his grandparents, in the South End section of Boston. At the apartment, Akara showed Green's cousin a nine millimeter Desert Eagle semiautomatic handgun, the same type of gun used in the shooting, and explained that he and Green had "had a beef on the train." A few weeks earlier, another of Green's cousins had seen Akara with the same weapon. The gun, a type rare in Boston at the time, was later recovered in connection with an unrelated incident and linked to the February 5, 2003, shootings by ballistics evidence.

The defendants left the apartment for approximately thirty minutes. When they returned, Akara was no longer wearing the jacket and hat he had been wearing on the train. Green was still wearing a black hooded sweatshirt with a distinctive pointed hood; after the night of the shooting, he was not seen wearing that sweatshirt.[7] One of Green's brothers informed them that a pregnant woman had been shot on the subway. Akara responded, "Oh shit," and Green responded, "Damn it."

Akara left and returned to Christopher's house. Green also left, going to the apartment of his girl friend, Sheena Sanford, where he spent the night. Later that night and into the early morning hours, Akara and Green spoke with each other by telephone four times. On one occasion when Akara called, Sanford answered, and Akara asked her, "Did I get away with it?" According to Christopher, who overheard Akara speaking on the telephone, Akara sounded like he was "giving orders," saying something to the effect that the person on the telephone should "bring it back" or "bring it here," and calling the

---

[7]Green testified that he had disposed of the sweatshirt after the shooting.

individual "stupid." After one call to Green, Akara told Christopher that "things [were] getting hot."

In the ensuing days, Akara and Green talked to two of Green's relatives about the shooting. Akara called Green's brother six times to ask him if he had heard anything and to warn him, "Don't say anything. Don't snitch." Akara similarly instructed Green's cousin not to tell the police anything and not to "snitch"; he mentioned he was concerned there might be gun powder on his gloves. Akara also mentioned that there might be gunpowder on his gloves. Green also told his cousin not to talk to the police.

Police officers recovered videotape surveillance images that placed Akara, Green, Brown, and Ramsey-White inside the Forest Hills subway station at approximately 7:30 P.M. Based on the videotape surveillance images, officers went to Akara's home on February 9, 2003, to talk to him about his involvement in the shooting. Akara denied being at the Forest Hills or Massachusetts Avenue subway stations that evening or being on an Orange Line train, denied wearing a baseball cap with the interlocking letters "TC," and denied knowing Green, Brown, and Ramsey-White. The next day, Green was interviewed at police headquarters. Green similarly denied being at those locations on February 5, and denied wearing a black hooded sweatshirt.

Police spoke with Barry several times concerning the identity of the shooter. Barry told police that a person matching Green's description — a dark-skinned African-American male with a big mouth and a top lip bigger than the bottom lip — took something out and shot her as she was exiting the train. The man was the smallest of the group of four he was with, and was wearing a hooded jacket with the hood down and a black nylon bandana tied in the back of his head.[8] She noticed that, prior to the shooting, he kept his hand in his pocket and was moving it around, as though clutching something. Nine days after the shooting, when shown a photographic array containing eight photographs, she immediately identified a photograph of Green as the shooter.

---

[8]According to Green's testimony, he was wearing a "doo rag" underneath his sweatshirt hood on the day of the shooting.

One month after the shooting, Gadsden was placed in the same holding cell as Akara in the Nashua Street jail. As Gadsden was being escorted into the cell, Akara stepped out and punched him in the face.

2. *Discussion.* a. *Sufficiency of the evidence.* The defendants contend that the verdict should be vacated because the evidence was insufficient to support both of the alternative theories of joint venture. "In reviewing a denial of a motion for a required finding of not guilty, we ask whether, viewing the evidence in the light most favorable to the Commonwealth, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Commonwealth* v. *Perez,* 460 Mass. 683, 702 (2011), quoting *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979). "Questions of credibility are to be resolved in the Commonwealth's favor, and circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt." *Commonwealth* v. *Miranda,* 458 Mass. 100, 113 (2010), cert. denied, 132 S. Ct. 548 (2011). "Where the evidence is largely circumstantial, it is not essential that the inferences drawn should be the only necessary inferences. It is enough that the inferences 'be reasonable and possible.' " *Commonwealth* v. *Deane,* 458 Mass. 43, 50 (2010), quoting *Commonwealth* v. *Garuti,* 454 Mass. 48, 54-55 (2009).

At the time of trial, to establish joint venture required proof that a defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit [the] crime, and (3) by agreement, [was] willing and available to help the other if necessary." *Commonwealth* v. *Zanetti,* 454 Mass. 449, 455 (2009), quoting *Commonwealth* v. *Green,* 420 Mass. 771, 779 (1995). On appellate review, a court considers whether the evidence supports a finding that "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." *Commonwealth* v. *Norris,* 462 Mass. 131, 138-139 (2012), quoting *Commonwealth* v. *Zanetti, supra* at 467-468.

To permit a conviction of murder in the first degree on the theory of extreme atrocity or cruelty, a defendant must have "an intent to cause death, to cause grievous bodily harm, or to

do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." *Commonwealth* v. *Norris, supra* at 139, quoting *Commonwealth* v. *Pimental*, 454 Mass. 475, 480 (2009). "Conviction of assault with intent to murder requires proof of . . . a specific intent to kill" and "the absence of justification, excuse, and mitigation." *Commonwealth* v. *Johnston*, 446 Mass. 555, 558 (2006), quoting *Commonwealth* v. *Henson*, 394 Mass. 584, 591 (1985). The judge properly instructed the jury that an intent to kill may be inferred from the use of a firearm. See *Commonwealth* v. *Smith*, 456 Mass. 476, 488 (2010). The judge also properly instructed the jury on the doctrine of transferred intent, telling them that the Commonwealth must prove that the defendants intended to kill Gadsden, but, in attempting to do so, caused the death of a different victim. See *Commonwealth* v. *Taylor*, 463 Mass. 857, 863 (2012).

In the unusual circumstances of this case, the Commonwealth presented two alternative and mutually exclusive versions of events. The strongest evidence against either defendant that he "knowingly participated in the commission of the crime charged . . . with the intent required for that offense" was that he pulled the trigger. Ordinarily, under *Commonwealth* v. *Zanetti, supra* at 468, we would not need to "examine the sufficiency of the evidence separately as to principal and joint venture liability." Where, however, the evidence does not support a conclusion that both defendants fired the weapon, to ensure that the jury's verdicts are legally supportable, we must determine whether the evidence, considered in the light most favorable to the Commonwealth, supports the conclusion that each defendant, although not the shooter, participated in and shared the requisite intent to commit the crime. See *id.* at 455-456. See also *Commonwealth* v. *Miranda, supra* at 114 ("The fact that the Commonwealth's evidence permitted alternative versions is not of legal significance so long as each version is legally supportable under the *Latimore* standard").[9]

The jury could have found that Akara was the shooter based

_____

[9]Our review of the evidence in this case ensures that the jury could not have relied solely on the evidence that Akara was the shooter in order to find him guilty as a joint venturer, and solely on the evidence that Green was the

on the evidence introduced at trial and reasonable inferences drawn therefrom. Akara had been in possession of a gun similar to the murder weapon a few weeks before the shooting. Minutes before the shooting, Gadsden observed Akara holding a gun. As he fled the scene with Green, Akara was seen clutching something shiny in his waistband. After the shooting, Akara expressed concern that gun powder residue might be found on his gloves.

Based on evidence at trial and reasonable inferences drawn therefrom, the jury could have found that Green knowingly participated in the shooting with the requisite intent. The jury could have concluded that, as Green stood next to Akara on the train, he could see Gadsden "throwing glances" at Green and Akara, and Akara looking back at Gadsden. The jury could have inferred that Green then observed Akara take out a gun and point it at Gadsden. Green remained with Akara as the two left the train by door number three and stood together on the platform, and while Akara shot into the crowd exiting the train. Green fled the scene with Akara, laughing and chuckling with him and their two friends. Later, Akara and Green continued to work together to ensure they would not be apprehended. See *Commonwealth v. Dixon*, 79 Mass. App. Ct. 701, 711-712 (2011) (evidence of joint flight "could have supported a finding that each of them was willing and available to assist the other if necessary"). See also *Commonwealth v. Williams*, 422 Mass. 111, 121 (1996) ("Joint venture may be proved by circumstantial evidence, including evidence of flight together"); *Commonwealth v. Morrill*, 14 Mass. App. Ct. 1003, 1004 (1982) (laughter coming from defendant and others' direction was evidence that defendant was joint venturer with others). The evidence was sufficient to support a finding that Green shared Akara's intent to commit the crimes charged and was willing to, and did, assist him in accomplishing the crimes and during the getaway.

There was also evidence providing a sufficient basis for an alternative finding: that it was Green who had fired the shots intended to hit Gadsden, and that Akara shared his intent and

shooter in order to find Green guilty as a joint venturer. Had there been insufficient evidence as to each defendant that he had knowingly participated in the crimes charged with the requisite intent (apart from evidence of the shooting), a jury instruction on joint venture would not have been warranted.

knowingly participated in the shooting. There was evidence that Green and Akara had a tense exchange with Gadsden on the train. The jury reasonably could have inferred that Akara had passed the gun to Green at some point before the shooting, and that Green clutched the gun in his pocket until the two left the train and Green fired at Gadsden. The jury could have credited Barry's testimony that, as Green "was coming out of the train, I saw his hand taking something and shooting me." On this version of events, the jury reasonably could have determined that Akara provided assistance to Green by handing him the gun that had been in Akara's possession; that Akara stood by Green as he fired the weapon at Gadsden; and that Akara and Green fled the scene and continued to work together after the shooting in order to ensure that they would not be apprehended by the police.

Because the evidence supports each alternative finding, the jury could have found beyond a reasonable doubt that both defendants "knowingly participated in the commission of the crime[s] charged, . . . with the intent required for [those] offense[s]." *Commonwealth* v. *Zanetti, supra* at 468.

b. *Severance.* As they did repeatedly at trial, the defendants contend on appeal that their trials should have been severed because their defenses were mutually antagonistic and irreconcilable. See *Commonwealth* v. *Moran,* 387 Mass. 644, 655 659 (1982). We review for an abuse of discretion. See *Commonwealth* v. *Siny Van Tran,* 460 Mass. 535, 543 (2011).

"Denial of a motion for severance is an abuse of discretion when 'the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial.' " *Commonwealth* v. *Vasquez,* 462 Mass. 827, 836 (2012), quoting *Commonwealth* v. *Moran, supra* at 658. "In order for such compelling prejudice to arise, it is not enough that the defendants are hostile to one another or that one defendant would have a better chance of acquittal if tried alone." *Commonwealth* v. *Vallejo,* 455 Mass. 72, 86 (2009), quoting *Commonwealth* v. *McAfee, supra* at 486. "Rather, severance is required only if the defenses are both mutually antagonistic (or mutually exclusive) and irreconcilable." *Commonwealth* v. *Vasquez, supra.* Defenses are mutually antagonistic and irreconcilable where "[t]he sole defense of each was the guilt of the other," or "where the ac-

ceptance of one party's defense will preclude the acquittal of the other." *Commonwealth* v. *Moran, supra* at 656-657, quoting *United States* v. *Crawford*, 581 F.2d 489, 491-492 (5th Cir. 1978), and *United States* v. *Ziperstein*, 601 F.2d 281, 285 (7th Cir. 1979), cert. denied, 444 U.S. 1031 (1980).

Nonetheless, "even mutually antagonistic and irreconcilable defenses do not require severance if there is sufficient other evidence of guilt." *Commonwealth* v. *Vasquez, supra* at 838. See *Zafiro* v. *United States*, 506 U.S. 534, 538 (1993) ("Mutually antagonistic defenses are not prejudicial per se"). Where the jury were warranted in finding each defendant guilty on the basis of "eyewitness testimony and other evidence," we have concluded that any prejudice resulting from a joint trial was not so compelling that it prevented such defendants from obtaining a fair trial. See *Commonwealth* v. *Siny Van Tran, supra* at 543 & n.13, quoting *Commonwealth* v. *Stewart*, 450 Mass. 25, 31 (2007). Cf. *Commonwealth* v. *Moran, supra* at 654, 659 (failure to sever prejudicial where defendants were the only witnesses, each defendant testified and accused codefendant, and Commonwealth's case tended to prove "that at least one defendant, but not necessarily both of them, robbed and killed [the victim]").

Even assuming without deciding that the defenses in this case were mutually antagonistic and irreconcilable, see *Commonwealth* v. *Stewart, supra*, the denial of the defendants' motions to sever was not an abuse of discretion, because there was "considerable independent evidence" of the guilt of each defendant. *Commonwealth* v. *Vasquez, supra* at 838 & n.10 ("For purposes of severance, independent evidence is evidence that is not offered by one defendant against another at their joint trial"). Before trial, the motion judge denied the defendants' motion to sever on the ground that the grand jury testimony and exhibits provided by the Commonwealth showed that there was sufficient independent evidence of the defendants' guilt as joint venturers. At trial, fourteen witnesses described the events on the subway car from the time the defendants boarded the train together at the Forest Hills station until they fled the Massachusetts Avenue station together after the shooting. Testimony by five additional witnesses, in conjunction with telephone records and surveillance images, established that, after fleeing the

scene together, the defendants remained in contact later that night, and, in the ensuing days, encouraged potential witnesses not to speak with police. Thus, "the jury could easily [have] rel[ied] on evidence other than the inculpatory suggestions of one defendant against the other" to conclude that both defendants were guilty of the charged offenses. See *Commonwealth* v. *Siny Van Tran, supra* at 543 n.13. "In light of that evidence and the fair inferences it supported, whatever prejudice that resulted from the joint trial was not 'so compelling that it prevent[ed] [the defendants] from obtaining a fair trial.' " *Commonwealth* v. *Vasquez, supra* at 838, quoting *Commonwealth* v. *Stewart, supra.*

c. *Jury instructions.* i. *Joint venture.* The defendants argue that the judge erred in declining to give the instruction requested by the defendants that, if the jury could not determine who acted as principal and who as a joint venturer, they had to find beyond a reasonable doubt that a joint venture existed. The instruction on joint venture which the judge gave was correct.

A jury may convict a defendant of murder without deciding whether he was the shooter or an accomplice, as long as the jury finds beyond a reasonable doubt that the defendant and another (either one of whom could have fired the fatal shot) "were involved in a joint venture during which the victim was killed." *Commonwealth* v. *Pike*, 431 Mass. 212, 215 (2000). The judge instructed the jury that, in order to find the defendants guilty on the basis of joint venture, "the Commonwealth must prove [the elements of joint venture] beyond a reasonable doubt." The judge then gave a detailed and accurate instruction on joint venture, accompanied by a printed handout listing the required elements and reiterating that each element must be found beyond a reasonable doubt. The judge was not required to give an instruction exactly as requested by the defendant. See *Commonwealth* v. *Martinez*, 437 Mass. 84, 92 (2002).

ii. *Extreme atrocity or cruelty.* Akara argues that the judge erred in his instruction on murder in the first degree on a theory of extreme atrocity or cruelty, because he deviated from the model jury instructions. Since the issue was not preserved, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). We conclude that there was no error.

In deciding whether a killing was committed with extreme atrocity or cruelty, the jury is to consider a set of enumerated factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983): "(1) whether the defendant was indifferent to or took pleasure in the victim's suffering; (2) the consciousness and degree of suffering of the victim; (3) the extent of the victim's physical injuries; (4) the number of blows inflicted on the victim; (5) the manner and force with which the blows were delivered; (6) the nature of the weapon, instrument, or method used in the killing; and (7) the disproportion between the means needed to cause death and those employed." *Commonwealth* v. *Whitaker*, 460 Mass. 409, 417 (2011), quoting *Commonwealth* v. *Linton*, 456 Mass. 534, 546 n.10 (2010).

The judge instructed on these factors based on the language of the instruction in the Superior Court Model Jury Instructions on Homicide 11-14 (1999), then further instructed as follows:

> "A murder may be committed with extreme atrocity or cruelty in the totality of the circumstances, even though the victim's death . . . results from a single blow. You need not necessarily find that [the victim] suffered consciously, although you may consider that fact along with the other facts that I have outlined. Extreme atrocity or cruelty requires the jury to consider the defendant's actions and their effect on the victim. But it does not require that the defendant be aware of how shocking his actions were or how much suffering his conduct caused the victim."

Akara argues that this instruction improperly suggested that the *Cunneen* factors are "separate theories of liability, any one of which constitutes proof of the crime."

The instruction given was accurate.[10] Although no single *Cunneen* factor is "indispensable" to a determination of extreme atrocity or cruelty, see *Commonwealth* v. *Whitaker*, *supra* at 417-418, quoting *Commonwealth* v. *Garabedian*, 399 Mass.

---

[10]The judge tape recorded his charge and also provided the jury a document summarizing his key jury instructions, including the factors to be considered when determining if the killing was committed with extreme atrocity or cruelty. Both the audio recording and the typed summary were available to the jury in the jury room. See *Commonwealth* v. *Jefferson*, 416 Mass. 258, 264-265 (1993).

304, 311 (1987), "conviction of murder in the first degree on a theory of extreme atrocity or cruelty must be based on evidence of at least one of the factors enunciated in *Commonwealth* v. *Cunneen*, [*supra*]." *Commonwealth* v. *Szlachta*, 463 Mass. 37, 46 (2012).

The judge's challenged instruction was a clear and correct statement of the law. A murder may be committed with extreme atrocity or cruelty even if the victim is struck by a single blow. *Commonwealth* v. *Freiberg*, 405 Mass. 282, 290 n.3, cert. denied, 493 U.S. 940 (1989). Furthermore, the victim need not suffer consciously in order for a killing to be committed with extreme atrocity or cruelty. *Commonwealth* v. *Garabedian, supra*. Finally, it is "not necessary that the defendant know that his act was extremely atrocious or cruel." See *Commonwealth* v. *Cunneen, supra* at 227-228, and cases cited.

iii. *Instruction on sentencing.* Akara maintains that one of the judge's instructions had the effect of removing from the jury's consideration evidence of Green's motive to testify falsely in order to avoid a sentence of life without the possibility of parole or another lengthy sentence. In this regard, Akara points to Green's testimony, elicited on cross-examination, that Green knew that the penalty for murder in the first degree was imprisonment for life without the possibility of parole. Akara argues that this testimony was indicative of Green's potentially biased testimony, because Green would want to avoid such a severe sentence and thus would be motivated to implicate Akara. Had the judge's instruction not removed the issue of sentencing from their consideration, Akara argues, the jury would have been permitted to consider whether Green, his family, and his girl friend were telling the truth about who committed the killing.[11]

---

[11]After a sidebar discussion during the judge's charge at which Akara's counsel objected to the standard instruction, the judge instructed as follows:

> "Deciding whether to return a verdict of guilty instead of a verdict of not guilty, please do not be concerned about the question of punishment. The punishment to be imposed should the defendant be found guilty is exclusively the responsibility of the Court to determine. Please do not try and guess what the punishment might be. The issue of punishment should not enter your consideration or discussions at any time."

The judge properly instructed the jury that they were not to consider the issue of sentencing when deciding the guilt or innocence of either defendant. See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 124 (1977) (sentencing consequences of verdict may not be submitted to jury whose "function is solely one of fact finding with respect to the legal standards regarding innocence or guilt"). Accord *Commonwealth* v. *Gunter*, 427 Mass. 259, 270 (1998). When considered in light of the instructions as a whole, the instruction complained of would not have had the effect that Akara claims. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980) (charge is reviewed in its entirety to determine over-all impact on jury). The evidence of potential bias was before the jury, and the judge's instructions adequately conveyed to them that they could consider whether Green had a motive to lie in order to avoid a life sentence. The judge instructed also that:

> "You may also consider the witness's motive for testifying. Whether the witness displayed any bias in testifying and whether or not the witness has any interest in the outcome of the case. The fact that a witness may have some interest in the outcome of a case doesn't necessarily mean that the witness isn't trying to tell you the truth as that witness recalls it or believes it to be, but the witnesses' interest is a factor that you may consider along with all the other factors. . . .
>
> "In this case, the defendant, Mr. Green, chose to testify. So you should examine and evaluate his testimony just as you would the testimony of any other witness with an interest in the outcome of the case. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in this case."

Thus, the instructions properly directed the jury to consider any potential bias, while also preventing the jury from reaching a "result-oriented verdict" based on their knowledge of the possible sentence. *Commonwealth* v. *Gunter*, *supra* at 270, quoting *Commonwealth* v. *Ferreira*, *supra* at 125.

d. *Closing arguments*. i. *Prosecutor's closing*. The defendants

contend that they were prejudiced by the prosecutor's improper argument, to which they objected, that the jury should find that a joint venture existed because the "Boston police, the District Attorney's office, and the Suffolk County Grand Jury had heard sufficient evidence to charge not one, but two people."

It is well established that a prosecutor may not suggest that the existence of an indictment is evidence of guilt. See *Commonwealth* v. *De Francesco*, 248 Mass. 9, 13 (1924) ("the presumption of innocence means that the finding of an indictment by the grand jury . . . [is] not to be regarded as circumstances tending to [in]criminate the defendant or creating against him unfavorable impressions"). See also *United States* v. *Bess*, 593 F.2d 749, 754 (6th Cir. 1979) ("it is always improper for a prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted"). The prosecutor's remark went to the heavily contested issue of joint venture. See *Commonwealth* v. *Shelley*, 374 Mass. 466, 471 (1978), *S.C.*, 381 Mass. 340 (1980), and 411 Mass. 692 (1992).

Although the judge did not mitigate the error by giving an immediate curative instruction, in his charge to the jury he instructed:

> "I told you at outset of this trial, that the fact . . . [that the] defendants are seated in front of you and accused of allegedly committing crimes against the Commonwealth of Massachusetts is not evidence of his or her guilt and it should not be taken as raising any inference or prejudice against him or them. An indictment . . . is simply a written accusation by a grand jury accusing somebody of a crime. It is one of the methods used in our . . . Commonwealth to bring somebody accused of a crime to trial in front of you the jury. The fact that somebody is indicted of a crime is not evidence that they committed a crime and should not be considered for that purpose."

The judge's charge, following shortly after closing argument and responding to the prosecutor's improper argument, mitigated the error. We conclude that the improper remark could not have made a difference in the jury's conclusions. *Commonwealth* v. *Beaudry*, 445 Mass. 577, 584-585 (2005).

ii. *Closing argument by Green's counsel.* Akara contends that he was prejudiced by certain improper statements made by Green's counsel during his closing argument. Akara claims that Green's counsel implicitly commented on Akara's decision not to testify, personally vouched for the credibility of his client and members of the Green family, and inflamed the jury's passions against Akara. Because Akara objected to each statement, we review for prejudicial error. *Commonwealth* v. *Burgos,* 462 Mass. 53, 66-67, cert. denied, 133 S. Ct. 796 (2012).

"In general . . . the standards [of proper trial conduct] are the same for prosecutor and defense counsel." *Commonwealth* v. *Murchison,* 418 Mass. 58, 59 (1994). However, "the identity of the speaker can make a difference" when determining whether a remark made during closing argument was erroneous or prejudicial. *Commonwealth* v. *Vallejo,* 455 Mass. 72, 80 (2009), quoting 75A Am. Jur. 2d Trial § 490 (2007 & Supp. 2009). Although we have declined to "map the precise contours of the application of that principle," *Commonwealth* v. *Vallejo, supra* at 81. Since the prosecutor has an "institutional role," such comments by a prosecutor may be more prejudicial to a defendant than similar comments by his codefendant's counsel. See *United States* v. *Mena,* 863 F.2d 1522, 1534 (11th Cir.), cert. denied, 493 U.S. 834 (1989).

While improper statements by counsel for a codefendant may result in prejudice to a defendant, they are less likely to do so than improper arguments by a prosecutor, given the prosecutor's position of authority and trust.

> "[T]he prosecuting attorney 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' . . . It is further true that 'the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.' "

*Commonwealth* v. *Shelley, supra* at 472, quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935). "To permit counsel to express a personal belief in [any witnesses'] testimony . . . creates the false issue of the reliability and credibility of counsel. This is peculiarly unfortunate if one of them has the advantage of official backing." *Commonwealth* v. *De Christoforo*, 360 Mass. 531, 547 (1971) (Tauro, C.J., dissenting), quoting *Greenberg* v. *United States*, 280 F.2d 472, 475 (1st Cir. 1960).

In any event, whether a claim of improper argument is lodged against counsel for a codefendant or against the prosecutor, "we allow great latitude to counsel in argument," *Commonwealth* v. *Murchison, supra* at 60, and "assume that jurors have a measure of sophistication in sorting out excessive claims." *Id.* See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

Green's counsel argued that his client had the "courage" to testify. Akara claims that this argument was tantamount to a comment on Akara's decision not to testify. Where two defendants are tried together, counsel for an individual defendant is entitled to emphasize his own client's decision to testify, so long as he does not make a "direct reference" to the codefendant or "expressly contrast [his client's] willingness to speak" with the codefendant's "apparent unwillingness to do so." *Commonwealth* v. *Vallejo, supra* at 80-81. The statements made by Green's counsel are similar to those made by counsel in *Commonwealth* v. *Vallejo, supra* at 77-78. Green's counsel argued that his client showed "courage to get up from that seat, and walk to that seat and to subject himself to a blistering cross-examination by Mr. Akara's attorney." He made no direct reference to Akara's silence, but, rather, emphasized that his client faced cross-examination from two motivated adversaries, the prosecutor and counsel for Akara. This argument was not improper.

Akara maintains also that Green's counsel vouched for Green's testimony at several points. Akara points to statements in which Green's counsel argued that Green was not smart enough to concoct a family conspiracy that put the blame for the shooting on Akara, as Akara's counsel had suggested. Green's counsel asserted that, were Akara's contention true, he, as Green's

attorney, would have had to have been personally involved in such a conspiracy, and he had not been.

It is improper for an attorney to vouch for a witness by "express[ing] a personal belief in the credibility of a witness" or to "indicate[] that he or she has knowledge independent of the evidence before the jury verifying a witness's credibility." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989), citing *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 878 (1984); *Commonwealth* v. *Shelley*, *supra* at 470. Thus, these statements should not have been made. We conclude, however, that these and similar statements that arguably vouched for the credibility of particular witnesses did not prejudice Akara. The jury would have understood that Green's counsel was acting in the role of a zealous advocate, and would have been "able to recognize his arguments as advocacy and not statements of personal belief." *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). Moreover, any potential prejudice was ameliorated by the judge's instruction that closing arguments are not evidence. See *id.* at 351.

Akara contends further that Green's counsel inflamed the jury's passions against Akara by urging that they focus on the autopsy photographs, stating, "That's what Chimezie Akara did on February 5, 2003."[12] While these remarks were improper, considering them in the context of the entire closing argument, and in conjunction with the conduct of the trial as a whole, we conclude that defense counsel's improper remarks "are unlikely to have affected the jury's verdicts." See *Commonwealth* v. *Barros*, 425 Mass. 572, 582 (1997). The evidence of each defendant's guilt was strong. Moreover, in his closing argument the prosecutor asked the jury not to base their decision on sympathy for the victim. The judge properly instructed the jury that they must decide the case only on the evidence and not on any sympathy they might feel. The error did not prejudice Akara.

e. *Bruton issue.* Green's girl friend, Sanford, testified that Akara asked her, when she answered the telephone on the night

---

[12]The limited number of autopsy photographs introduced in evidence were allowed, after review by the judge, as relevant to support a finding of extreme atrocity or cruelty; the judge ordered excluded those photographs that he determined to be too prejudicial.

of the shooting, whether "they [were] going to get away with it." On cross-examination, after reviewing her grand jury testimony, she corrected herself, and testified that Akara had asked her, "Did I get away with it?"

Green argues that the admission of Akara's statement, through Sanford, violated his rights under the Sixth Amendment to the United States Constitution and the rule set forth in *Bruton* v. *United States*, 391 U.S. 123, 137 (1968). The admission of Sanford's original testimony concerning Akara's statement would have been an error; however, the error was mitigated by her correction on cross-examination. In effect, she testified that Akara implicated only himself. Thus, the admission of the statement does not offend *Bruton* v. *United States*, *supra*. Contrast *Commonwealth* v. *Rivera*, 464 Mass. 56, 69 (2013), quoting *Commonwealth* v. *McAfee*, 430 Mass. 483, 488 (1999) (" 'Where a nontestifying codefendant's statement "expressly implicate[s]" the defendant, leaving no doubt that it would prove to be "powerfully incriminating," the confrontation clause of the Sixth Amendment . . . has been offended,' notwithstanding any limiting instruction by the judge that the jury may consider the statement only against the codefendant").

f. *Gang evidence.* The defendants contest the admission of evidence concerning their purported gang affiliation. Expert testimony concerning gangs in general, and in particular concerning Tent City, a gang in which the defendants where alleged to have been members, was introduced through Sergeant Detective John M. Brown of the Boston police department. The defendants objected to the admission of any gang-related evidence; the judge allowed Brown's testimony to be admitted for the limited purpose of showing motive and joint venture.

Brown testified that the Boston police department classifies as a gang any "group, organization, or association of four or more people, usually under the age of [twenty-five]," who call themselves by a group name and have various common identifying signs, symbols, or clothing items. Based on these criteria, the Boston police department classified Tent City as a gang. Graffiti found on a sign at the Forest Hills MBTA station and on seats on the Orange Line train car directly behind car 1205

were characteristic of Tent City.[13] Brown testified that Tent City and many other groups associated with the South End neighborhood of Boston have informal structures and relatively few members, in contrast to larger, highly organized gangs like those based in Los Angeles, California. Other than a brief mention of vandalism, he did not discuss any criminal activity by Tent City or other similarly structured groups.

There was also testimony from other witnesses that both defendants, as well as Brown and Ramsey-White, were associated with Tent City. Sanford was permitted to testify that the defendants were members of Tent City, and that Green owned a Twin Cities cap associated with that gang. Another witness stated that Green regularly socialized with the "Tent City kids." Green's statement to police that he was known to be associated with Tent City, but that he could not name any other members, was admitted through an interrogating officer.

No evidence was presented that the motive for the shootings was gang-related. Nor was there evidence that Gadsden was affiliated with Tent City or any rival group. There was also no evidence concerning any previous interactions between the defendants and Gadsden, or between Gadsden and any other members of Tent City, prior to the day of the shooting.

Gang evidence may be admissible to show motive or to establish joint venture. *Commonwealth* v. *Swafford*, 441 Mass. 329, 332-333 (2004). We have urged caution in admitting gang-related evidence, however, because "evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence." *Commonwealth* v. *Phim*, 462 Mass. 470, 477 (2012). Although "not all gangs are the same and not all gang affiliations are the same," com-

---

[13]On the day of the shooting, a Massachusetts Bay Transportation Authority (MBTA) police officer observed the words "Tent City" and an interlocking "T" and "C" written in green marker on a sign at the Forest Hills MBTA station. A Boston police expert testified that the graffiti featuring an interlocking "T" and "C," which resembles the "Twin Cities" logo used by the Minnesota Twins baseball team, is associated with the Tent City gang.

Following the shooting, investigating officers discovered graffiti in the train car immediately behind the car in which the shooting occurred. The words written in the car included "Kese," "Stacks," "Bo," "Tent City," "TC," "South End," and "P.I.C." Green's nickname is "Kese"; Brown's nickname is "Stacks"; and Ramsey-White's nickname is "Bo."

munity attitudes towards gang violence are likely to color such evidence. See Hagedorn & MacLean, Breaking the Frame: Responding to Gang Stereotyping in Capital Cases, 42 U. Mem. L. Rev. 1027, 1029 (2012), quoting Tenn. Ass'n of Crim. Def. Law., Death Penalty Mitigation Manual § H, at 1 (2010). We have most often allowed gang evidence to be admitted for the purpose of establishing joint venture in cases where the evidence showed that the offense involved retaliation or conflict between rival gang members, and that the defendants therefore shared a common motive. See, e.g., *Commonwealth* v. *Swafford*, *supra* at 332-334.

The gang evidence here was relevant because it supplied additional evidence of the defendants' relationship, which supported the Commonwealth's case for joint venture. Consistent with this evidence, the prosecutor focused his closing argument on the relationship of the parties to one another, which included their participation in a gang that used phrases like "partners in crime" and other common symbols suggesting that the defendants were "one for all and all for one." The prosecutor argued that, "[Akara] and [Green], I suggest to you, members of the jury, are two good friends. They're two members of the Tent City gang. Two men that were acting together, and two men who were thinking together on [the night of the shooting]." The prosecutor did not suggest that the gang or its members had a history of violence, or that their affiliation made either man more likely to participate in violent crimes. Such an argument would have been improper propensity evidence. See *Commonwealth* v. *Phim*, *supra*.

Through his careful questioning of potential jurors during voir dire, the judge sought to ensure that jurors could be fair and impartial concerning gang evidence.[14] He removed one seated juror midway through the trial because she lived in the same building as several of the Green family witnesses and was

---

[14]The judge asked members of the venire:

"In this case there may be evidence that one or both of the defendants may have been associated with an alleged gang at the time of the alleged crimes. Would that fact affect your ability to be a fair and impartial juror, and to decide this case based solely on the evidence introduced in this Courtroom and the law as I instruct you?"

concerned about being identified for retaliation by gang members. See *Commonwealth* v. *Maldonado*, 429 Mass. 502, 506-507 (1999) (judge properly removed juror who expressed fear of gang retribution). The gang-related evidence introduced did not describe Tent City members as being involved in criminal activity aside from small-scale vandalism; rather, the emphasis was on common identifying symbols, reflected in graffiti and clothing. Compare *Commonwealth* v. *Gray*, 463 Mass. 731, 756 (2012) (defendant prejudiced where rap video admitted to prove defendant's membership in gang depicted "stereotypical 'gangsta thugs' " with "lyrics such as 'forty-four by my side' "). We therefore conclude that the judge did not abuse his discretion in admitting evidence of the defendants' gang affiliation because the gang evidence admitted was limited and properly went to the issue of the defendants' relationship to one another. The risk of unfair prejudice did not outweigh the probative value of this evidence. See *Commonwealth* v. *Correa*, 437 Mass. 197, 201 (2002). Cf. *Commonwealth* v. *Gray, supra* at 753.

g. *Review under G. L. c. 278, § 33E*. After careful review of the entire record, pursuant to our obligation under G. L. c. 278, § 33E, we conclude that there is no basis to reduce the murder convictions to a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*