NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11668

COMMONWEALTH vs. JOSE FERNANDES.

Bristol.     January 9, 2023. - July 21, 2023.

Present: Budd, C.J., Lowy, Kafker, Wendlandt, & Georges, JJ.

Homicide. Armed Assault with Intent to Murder. Assault by
    Means of a Dangerous Weapon. Firearms. Electronic
    Surveillance. Constitutional Law, Search and seizure,
    Self-incrimination, Assistance of counsel. Evidence,
    Wiretap, Opinion, Prior misconduct, Photograph, Third-party
    culprit, Business record. Cellular Telephone. Practice,
    Criminal, Capital case, Discovery, Public trial, Argument
    by prosecutor, Assistance of counsel, Duplicative
    convictions.

Indictments found and returned in the Superior Court
Department on May 6, 2011.

The cases were tried before D. Lloyd Macdonald, J., and
motions for postconviction relief, filed on March 6, 2020, were
heard by Raffi N. Yessayan, J.

James W. Rosseel for the defendant.
Mary Lee, Assistant District Attorney, for the
Commonwealth.

GEORGES, J. The defendant, Jose Fernandes, was tried

before a Bristol County jury and convicted of murder in the

first degree for the May 17, 2009, shooting death of Troy Pina

(victim).[1]  The Commonwealth proceeded against the defendant on

theories of deliberate premeditation and joint venture

liability.  Among other evidence, the jury heard testimony from

the defendant's associate, Alexis Cruz, that the defendant

confessed to participation in the shooting.[2]  Cruz's testimony

was supported by secret recordings of the defendant discussing

his involvement.[3]

---

[1] In connection with the same shooting, the jury also
convicted the defendant of three counts of armed assault with
intent to murder, three counts of assault by means of a
dangerous weapon, and one count of carrying a firearm without a
license.  The jury acquitted the defendant of conspiracy to
murder witness Kathleen Soule.

[2] This case arises from the same shooting described in this
court's decision in Commonwealth v. Mitchell, 468 Mass. 417,
418-419 (2014).  In that case, the Commonwealth was granted
leave from a single justice of this court to file an
interlocutory appeal from a judge's allowance of Marcus
Mitchell's motion to suppress secret recordings for reasons not
relevant in this case.  The appeal was reported to the full
court.  See id. at 421.  The court held in relevant part that
the recording at issue was not an "interception" forbidden by
the Massachusetts wiretap statute, G. L. c. 272, § 99, because
it met the requirements of the statute's "one-party consent
exception."  See G. L. c. 272, § 99 B 4; Mitchell, supra at 428.
Specifically, the court observed that murder was "one of the
designated offenses listed in [G. L. c. 272,] § 99 B 7," and it
concluded that the facts before it regarding the May 17, 2009,
shooting evinced a sufficient nexus to organized crime such that
the judge did not err in finding that the murder was committed
in connection with organized crime.  See Mitchell, supra at 423,
425-428.  This latter issue is argued by the defendant here.

[3] These recordings were made pursuant to a warrant issued to
satisfy the requirements of art. 14 of the Massachusetts
Declaration of Rights.  See Commonwealth v. Blood, 400 Mass. 61,

On appeal from the verdicts and from the denials of his motions for a new trial, for an evidentiary hearing, and for further discovery, the defendant claims a number of errors, including that the secret recordings were not authorized by law and should not have been admitted in evidence, that Cruz should not have been permitted to testify to his understanding of certain slang used by the defendant, and that the defendant was prejudiced by the failure of the Commonwealth to turn over certain discovery.

We address these contentions and others infra, and for the reasons that follow, we affirm the denial of the motion for a new trial, the denial of the motion for an evidentiary hearing, and the denial of the motion for further discovery; we affirm the defendant's convictions on the charge of murder in the first degree, the three charges of armed assault with intent to murder, and the charge of carrying a firearm without a license; we vacate as duplicative the defendant's convictions on the three charges of assault by means of a dangerous weapon; and

---

77 (1987).  Nevertheless, as explained in note 8, infra, this Blood warrant was unnecessary because the conversations did not take place in a private home.  See Commonwealth v. Burgos, 470 Mass. 133, 134 n.1 (2014); Commonwealth v. Eason, 427 Mass. 595, 599-600 (1998).  Therefore, while part of the background of this case, the Blood warrant does not affect the lawfulness of the recordings at issue.  See Mitchell, 468 Mass. at 419 n.1.

after a thorough review of the entire trial record, we decline to allow relief under G. L. c. 278, § 33E.

Background. Viewing the evidence in the light most favorable to the Commonwealth, we recite the essential facts that the jury could have found, reserving certain details for our discussion of the issues. The defendant and Brian Lacombe were drug dealers, and both were part of "Supreme Team,"[4] an association that also included Thomas Jeffreys, Marcus Mitchell, Joey Gomes, and Cruz.

In May 2008, a feud began between Supreme Team and an individual named Francisco Monteiro.[5] As one way of obtaining money, Mitchell and other members of Supreme Team managed or promoted dancers at strip clubs. Monteiro did the same. At that time, Mitchell and Monteiro both were in South Carolina with dancers they promoted, during an event known as "Bike Week." A dancer associated with Mitchell tried to convince certain dancers associated with Monteiro to work with Mitchell instead, and Monteiro became upset (South Carolina dispute).

---

[4] The record includes references to this same association variously as "Supreme Team" and "Team Supreme." We refer to it by the former designation except when quoting other sources, although the difference is of no moment.

[5] Evidence in the record, although not before the jury, suggested that Monteiro was affiliated with other gangs.

The victim, a friend of Monteiro, was involved in this dispute as well.

By early 2009, the feud escalated into violence when Mitchell grabbed the victim and pushed him against a vending machine. After a verbal confrontation with Monteiro around the same time, Mitchell asked Jeffreys for a gun, and he obtained a .40 caliber gun from Jeffreys's girlfriend. The jury could have inferred that the defendant was the source of the gun given to Mitchell, as the defendant was acquiring guns from drug customers and supplying them to the team.

One or two months later, Monteiro "sucker punched" Jeffreys. Jeffreys was angry and vowed to shoot Monteiro. After that, Jeffreys, Mitchell, Cruz, Lacombe, and the defendant met at a pizza parlor. Jeffreys told everyone that "it was on" between Supreme Team, on the one hand, and Monteiro and the victim, on the other. From that point onward, the members of Supreme Team traveled together and carried guns. The defendant typically traveled with Lacombe. About one week after Monteiro punched Jeffreys, Monteiro shot Cruz outside a bar in Taunton. The other members of Supreme Team were angry and vowed revenge.

On May 16 and into the early morning hours of May 17, 2009, the defendant was traveling with Lacombe in one vehicle, and Jeffreys was traveling with Mitchell in another. The defendant carried a .45 caliber gun, and the three others carried .40

caliber guns. The defendant later told Cruz that they were "patrolling, hunting." Supreme Team encountered Monteiro at around midnight in the Whittenton area of Taunton, and Jeffreys fired three shots at him. The defendant and Lacombe were nearby but drove away after encountering a police vehicle.

Later that night, Jeffreys and the defendant positioned their vehicles to intercept Monteiro's vehicle on the highway. At about 1:40 A.M., Jeffreys and Mitchell shot at Monteiro's vehicle with .40 caliber guns from Jeffreys's black Infiniti. The defendant shot at Monteiro's vehicle with a .45 caliber gun from the vehicle that he was driving. At least three guns were used in the shooting, two .40 caliber guns and a .45 caliber gun. The victim, who was riding in the front passenger's seat of the vehicle driven by Monteiro, was killed.

In the hours leading up to and following the shooting, the defendant maintained cell phone contact with Jeffreys. After the shooting, Jeffreys parked the Infiniti where it was not visible from the street, and later that morning, the defendant went to the same location to pick up the Infiniti. At that time, a witness heard the defendant talking about something happening on the highway. Later examination of the Infiniti revealed a hasty repair to cover up what the jury could have inferred was a hole from a bullet that passed from inside to outside the vehicle. The same day, the defendant and Lacombe

went to a remote area with a box and a shovel. When they returned, they did not have the box. Asked what they were doing, Lacombe joked that they were burying a goldfish or a cat, and the defendant and Lacombe both laughed. About two weeks later, the defendant also traveled with Jeffreys and his brother, John Jeffreys,[6] when they went to intimidate a grand jury witness into providing false testimony regarding the shooting.

On August 23, 2010, the defendant was arrested for conspiracy to violate the drug laws. While the defendant was held on bail, in November 2010, the Commonwealth applied for and obtained a warrant authorizing the secret recording of the defendant. The recording was effected that same month by Cruz, a member of Supreme Team who cooperated with the Commonwealth after his arrest on gun charges. In the recordings and in other conversations with Cruz, the defendant admitted that he participated in the shooting along with Jeffreys and Mitchell; that he supplied the guns used in the shooting, which came from his customer; that he was carrying a .45 caliber gun that evening; and that he killed the victim. In fact, the victim was killed by a .40 caliber bullet, but a .45 caliber bullet was

---

[6] This opinion generally refers to Thomas Jeffreys simply as Jeffreys. To distinguish his brother, John Jeffreys, we use the latter's full name.

found on the floor near the front passenger's seat where the victim had been sitting.  The defendant confessed to "doing one" person and not being afraid of "doing another."  He also expressed his anger at how Mitchell had disposed of one of the guns.

In March 2013, a Bristol County jury found the defendant guilty of one count of murder in the first degree, three counts of armed assault with intent to murder, three counts of assault by means of a dangerous weapon, and one count of unlawful possession of a firearm.[7]  In May 2019, after a series of extensions and stays of appeal, the defendant filed a motion for postconviction discovery in this court, which motion was remanded to the Superior Court.  A Superior Court judge allowed the motion and ordered production of the Commonwealth's file related to the grand jury investigation, but the judge subsequently revised the order to exclude materials subject to work product protections.

In March 2020, the defendant filed with this court his motions for a new trial, for an evidentiary hearing, and for further discovery, which were also remanded to the Superior Court.  A Superior Court judge (motion judge) denied all three

---

[7] As noted supra, the jury acquitted the defendant of the remaining charge of conspiracy to murder a witness.

motions, and the appeal from these denials was consolidated with the appeal from the defendant's convictions.

Discussion. 1. Standard of review. We review the defendant's consolidated appeal pursuant to G. L. c. 278, § 33E, assessing preserved issues according to the appropriate constitutional or common-law standard and unpreserved issues for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Upton, 484 Mass. 155, 159-160 (2020). In analyzing the defendant's motion for a new trial where the motion judge neither presided at trial nor held an evidentiary hearing, we "examine [his] conclusion only to determine whether there has been a significant error of law or other abuse of discretion," although as he did not assess the credibility of any witnesses, we "regard ourselves in as good a position as the motion judge to assess the trial record." Commonwealth v. Jackson, 468 Mass. 1009, 1010 (2014), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).

2. Admissibility of secret recordings. The defendant's primary argument on appeal is that the jury should not have heard the secret recordings of the defendant's confessions to Cruz. The question then is whether the trial judge properly denied the defendant's motion in limine to exclude these recordings. We review the instant issue de novo because the defendant disputes only points of law, see Commonwealth v.

Mitchell, 468 Mass. 417, 421 (2014), specifically, (a) whether the evidence before the trial judge established a nexus to organized crime for purposes of the Massachusetts wiretap statute's "one-party consent exception," G. L. c. 272, § 99 B 4; and (b) whether the secret recordings violated certain of the defendant's constitutional rights.

a. Compliance with G. L. c. 272, § 99. General Laws c. 272, § 99 B 4, permits warrantless secret recording under the following conditions, collectively known as the wiretap statute's one-party consent exception:

> "[A] secret recording of a conversation is not an 'interception' and is therefore lawfully recorded without a warrant where (1) at least one party to the conversation gives prior consent to the recording of the conversation; (2) the party giving consent is a law enforcement officer or a person who has authorized a law enforcement officer to record the conversation; (3) the recording is made 'in the course of an investigation' of at least one of the designated offenses listed in § 99 B 7; and (4) the designated offense is 'in connection with organized crime[,' which] 'consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services.'"

Mitchell, 468 Mass. at 422, 425, quoting G. L. c. 272, § 99 A, B 4, B 7.[8]

---

[8] Even if this exception applies, art. 14 may yet require a warrant if the recording occurs in a private home. See Blood, 400 Mass. at 77. See also Eason, 427 Mass. at 599-600. As defense counsel correctly acknowledged during oral argument, Blood does not apply here where the defendant secretly was recorded while he was incarcerated. See Burgos, 470 Mass. at 134 n.1. Even so, "the better . . . course, and the most secure course constitutionally, is for law enforcement officials to

The defendant contends that the Commonwealth did not sufficiently establish a nexus "with organized crime," Mitchell, 468 Mass. at 422, so he concludes that the trial judge erred in applying the above exception to the facts of this case. This court already once has held that a sufficient nexus existed between organized crime and the murder at issue. See id. at 423, 426-428. In Mitchell, where it was sufficiently established that the defendant belonged to "Team Supreme," an organized and highly coordinated "drug distribution enterprise" engaged in "a bitter and violent feud" with Monteiro, where "at least four members of Team Supreme actively participated in the killing," and where "several more helped cover it up, including by hiding a gun that was used in the shooting and by conspiring to kill a potential witness," we held it "reasonable to infer that the shooting at issue here was undertaken at least in part in order to further Team Supreme's territorial or reputational interests," giving rise to "reasonable suspicion that the murder of [the victim] was [committed] in connection with organized crime." Id. at 418, 426-428. See Commonwealth v. Burgos, 470 Mass. 133, 142 (2014).

---

procure warrants . . . even in cases where it does not appear that the statutes require a warrant." Commonwealth v. Thorpe, 384 Mass. 271, 286 (1981), cert. denied, 454 U.S. 1147 (1982). In this case, the Commonwealth successfully applied for a Blood warrant, although it was not necessary.

The record in this case, in particular, the November 17, 2010, affidavit of State police Trooper Daniel M. Giossi (Giossi affidavit), supports the same findings as to these material facts.[9] On the basis of a witness statement and certain recent arrests, the Giossi affidavit averred the existence of "a drug enterprise operating in the city of Taunton . . . known as Team Supreme," with members including "Thomas Jeffreys, Jose Fernandes, Marcus Mitchell and Brian Lacombe." The affidavit detailed the escalating rivalry between Supreme Team and Monteiro and the victim, and it described certain members of the Supreme Team drug enterprise -- specifically including the defendant -- forming and executing a plan to shoot Monteiro, which plan ended in the shooting death of the victim. The

_____

[9] The Giossi affidavit had been submitted in November 2010 as part of the Commonwealth's effort to obtain a Blood warrant. As described in note 8, supra, a Blood warrant was unnecessary. Consequently, we do not analyze the sufficiency of the Giossi affidavit for purposes of obtaining a Blood warrant. Rather, we analyze it as evidence before the court in the February 2013 motion hearing. The question before the court at that hearing was whether in November 2010, at the time of the relevant recordings, the Commonwealth needed to apply for a warrant pursuant to the more stringent requirements of G. L. c. 272, § 99 E-F, or whether the recordings were exempt from those requirements pursuant to § 99 B 4. See Mitchell, 468 Mass. at 419 n.1, 421-422 (conducting similar analysis). There is no argument that a warrant was obtained pursuant to G. L. c. 272, § 99 E-F, for Cruz's secret recordings of the defendant, and in any event, an organized crime connection still would be required for the issuance of such a warrant. See Commonwealth v. Long, 454 Mass. 542, 555 (2009), S.C., 476 Mass. 526 (2017).

Giossi affidavit also described the efforts of Supreme Team to cover up the killing, including a conspiracy to murder a witness.[10]  In sum, the affidavit sufficed to establish the same conditions considered by this court in Mitchell, and so it sufficiently established a nexus to organized crime.  See Commonwealth v. Long, 454 Mass. 542, 557 (2009), S.C., 476 Mass. 526 (2017) ("there must, at the very least, be an organized plan from which one reasonably may infer the existence of an ongoing criminal operation").

The defendant argues that Mitchell is inapposite because there, the court had "no evidence . . . regarding the origins of the dispute between Monteiro's group and Team Supreme." Mitchell, 468 Mass. at 427.  Here, by contrast, the defendant contends that additional information shows the origin of the conflict to be the South Carolina dispute, which he argues is unconnected to organized crime.  See Commonwealth v. Lykus, 406 Mass. 135, 142 n.10 (1989), citing Commonwealth v. Jarabek, 384 Mass. 293, 296 (1981).  But the defendant can only disconnect the dispute from organized crime by isolating its original source from its later development, that is, from the important

---

[10] After trial, however, the jury did not convict the defendant for conspiring to kill the witness.

context laid out in the Giossi affidavit.[11]  In <u>Mitchell</u>, 468

Mass. at 427, this court cautioned against such a limited view

as unrealistic:

> "[I]t can be inferred that Monteiro and his associates
> posed at least a physical, and possibly economic, threat to
> Team Supreme's members and interests, and that the feud
> between the groups was more than personal.  Even if the
> feud were purely personal, an illegal drug distribution
> business may see the perception of weakness as potentially
> fatal to an enterprise that wishes to protect its turf
> against competitors.  In the perverse world of a street
> drug organization, violence in response to perceived
> threats is often viewed as necessary to maintain its
> customer base, to intimidate or weaken rivals, to protect
> its reputation, and to deter future threats from
> emerging. . . .  Given the history of violence between
> Monteiro and members of Team Supreme, it is reasonable to
> infer that the shooting at issue here was undertaken at

---

[11] We additionally note that during the pretrial hearing on the omnibus motion that included the relevant motion to exclude Cruz's recordings of the defendant, the defendant's counsel provided the trial judge two affidavits from State police Trooper Paul F. Baker dated July 19, 2010, and July 27, 2010. These affidavits had supported the Commonwealth's applications to record secretly the telephone calls of Jeffreys.  On appeal, the defendant argues that the judge could consider only the Giossi affidavit because that was the only affidavit specifically relied on by the Commonwealth for the motion at issue.  But the case he cites does not stand for this proposition, see <u>Burgos</u>, 470 Mass. at 137 (noting as background in that case that "the Commonwealth did not offer any evidence other than [a trooper's] affidavit"), and we discern no reason that the trial judge could not have relied on these affidavits as well, which predated the Giossi affidavit and which contained facts sufficient to connect the murder of the victim to organized crime.  The July 19, 2010, affidavit specifically alleged that Supreme Team was an ongoing drug distribution enterprise, described the feud between Supreme Team and Monteiro, and concluded that the purpose of the shooting at issue was "to protect [the] narcotics distribution operation" described in the affidavit.  Counsel conceded during oral argument that, based on Trooper Baker's investigation, there were indicia of organized crime from June to August 2010.

least in part in order to further Team Supreme's territorial or reputational interests."

This dispute did not run straight from an argument over dancers to the victim's murder but rather encompassed two other attacks by Monteiro on members of Supreme Team, including Monteiro's punching Jeffreys and shooting Cruz. Both episodes were described in the Giossi affidavit.

In sum, regardless of its origin, this was an ongoing dispute between Monteiro and members of a highly organized drug enterprise, and when the dispute escalated into violence, that enterprise organized its associates to commit and cover up a murder. Contrary to the defendant's claim, the fact that the dispute arose over one gang member's business and influence promoting dancers supports rather than undermines the nexus to organized crime. See Long, 454 Mass. at 556. Because there was a nexus between the murder and organized crime at the time of the recordings, the recordings did not violate G. L. c. 272, § 99, and we do not discern any error in the trial judge's denial of the defendant's motion to exclude them.[12]

---

[12] The defendant argues that the Commonwealth intentionally misled the Superior Court insofar as the Giossi affidavit did not reveal that the dispute between Monteiro and Supreme Team originated in a dispute over dancers and not drugs. But this argument ignores the more important scope and development of the dispute, which were recounted in the Giossi affidavit and placed before the trial judge prior to his ruling on the defendant's motion. Therefore, as described supra, the absence of information from the Giossi affidavit specifically describing

b.  Constitutionality of secret recordings.  More broadly, the defendant contends that by arresting him and allowing him to be questioned secretly by a government informant, the Commonwealth violated his right to be free from unreasonable searches and seizures, his right against self-incrimination, and his right to counsel.  We review constitutional claims de novo, see Commonwealth v. Martinez, 487 Mass. 265, 267 (2021), and conclude that there is no merit to these arguments.

As discussed supra, a warrant was not required by art. 14 of the Massachusetts Declaration of Rights or G. L. c. 272, § 99, to authorize the secret recordings at issue.  See Burgos, 470 Mass. at 134 n.1; Mitchell, 468 Mass. at 426-428.  Moreover, the defendant was not entitled to Miranda warnings where his confessions were made without coercion to an undercover informant, see Burgos, supra at 146, nor was the defendant's right to counsel under the Sixth Amendment to the United States Constitution implicated because, at the time of the recordings,

---

the South Carolina dispute did not affect the legality of the secret recordings.  Furthermore, we accept the motion judge's finding that there was no effort to mislead, where the Commonwealth had expressly informed the trial judge that the feud originated in a dispute over dancers.  Indeed, it did so during an earlier argument regarding the same omnibus motion in limine that included the motion at issue.

"he had not been indicted or charged in connection with the victim's murder."[13]  See id. at 146 n.12.

The defendant urges us to hold that the scope of the right to counsel under art. 12 of the Massachusetts Declaration of Rights is broader and applies where separate charges are nevertheless "inextricably intertwined."  See Commonwealth v. Rainwater, 425 Mass. 540, 547-548 (1997), cert. denied, 522 U.S. 1095 (1998), abrogated by Texas v. Cobb, 532 U.S. 162, 168 & n.1 (2001).  This court previously recognized this doctrine as an "extremely limited" exception to the otherwise offense-specific nature of the Sixth Amendment right to counsel, but the doctrine no longer exists under the Sixth Amendment.  See Rainwater, supra at 547 & n.5.  See also Cobb, supra.  We need not determine whether this doctrine continues in effect under art. 12 because the two sets of charges here are not inextricably intertwined, so the defendant's argument would fail regardless. See Commonwealth v. St. Peter, 48 Mass. App. Ct. 517, 522-523 (2000).  According to the defendant, the two sets of charges at issue are inextricably intertwined because they arose from a single police investigation aimed at the murder.  But even if

_____

[13] Because the right to counsel had not yet attached on the murder charge, it is immaterial whether, as the defendant argues, Cruz acted as a government agent for purposes of eliciting testimony about the murder.  See Burgos, 470 Mass. at 146 n.12, citing Commonwealth v. Murphy, 448 Mass. 452, 453 (2007).

this were true, the question is not whether the investigations were intertwined but whether "the pending charge is so inextricably intertwined with the charge under investigation that it cannot constitutionally be isolated from the uncharged offense" (alterations and citation omitted). Rainwater, supra at 547. See id. at 557 ("it is the criminal charge which calls [the] right into being and marks its extent"). Put another way, it is "whether the same acts and factual predicates underlie both the pending and the new charges" (citation omitted). Id. at 556.

Here, the two sets of charges lacked this identity. The defendant was held pursuant to fourteen charges of conspiracy to violate the drug laws, G. L. c. 94C, § 40. The allegations underlying these charges did not encompass the May 17, 2009, shooting. Rather, the charges arose from a series of drug deals allegedly orchestrated by the defendant over one year later in August 2010. What is more, in this case, the trial judge specifically instructed the jury at the defendant's request that they could not consider testimony about drugs as substantive evidence for the charges being tried. Indeed, the defendant's appellate counsel characterized these drug charges as "unrelated" in an affidavit supporting the defendant's motion for a new trial. For these reasons, the two sets of charges are not inextricably intertwined.

As part of his argument that the Commonwealth impermissibly used the drug charges to obtain information about the murder, the defendant also suggests that the Commonwealth misused the grand jury for discovery purposes.  But the disputed recordings were not obtained pursuant to the authority of the grand jury, and so the cases cited by the defendant are inapposite.  See Commonwealth v. Hall, 485 Mass. 145, 166 (2020) ("The defendant does not illustrate how this case is similar to Cote . . .");  Commonwealth v. Cote, 407 Mass. 827, 832 (1990); Commonwealth v. Liebman, 379 Mass. 671, 676-677 (1980), S.C., 388 Mass. 483 (1983).

3.  Testimony regarding meanings of slang terms.  The defendant further argues that it was error to permit testimony from Cruz as to the meanings of certain slang terms used during his conversations with the defendant.  Determinations of evidentiary "admissibility, probative value, and unfair prejudice are left to the sound discretion of the trial judge[] and will not be overturned absent clear error" (citation omitted).  Commonwealth v. Melendez, 490 Mass. 648, 662 (2022).

Where language is "ambiguous or consists of expressions not in common use" but has "a known meaning among certain persons," that meaning "may be explained by those who know."  Commonwealth v. Morgan, 107 Mass. 199, 201-202 (1871).  And this rule applies to slang.  See id. at 200, 201-202.  See also Commonwealth v.

Douglas, 354 Mass. 212, 218 n.2 (1968), cert. denied, 394 U.S. 960 (1969). Recent case law emphasizes the usefulness of expert testimony to interpret slang, jargon, or other coded language, but it acknowledges that context might be provided by other testimony as well. See Commonwealth v. Henley, 488 Mass. 95, 128 (2021); Commonwealth v. Rosa, 468 Mass. 231, 240 & n.14 (2014). Morgan, supra, implies that the relevance of such testimony is conditional on establishing that the witness has a basis for knowing the meaning. See Mass. G. Evid. § 104(b) (2023).

A witness's interpretation of evidence based on personal knowledge may also be considered lay opinion testimony "when the witness possesses sufficiently relevant familiarity . . . that the jury cannot also possess" (citation omitted). Commonwealth v. Vacher, 469 Mass. 425, 441 (2014). Lay opinion testimony is admissible where it is "(a) rationally based on the witness's perception; (b) helpful to a clear understanding of the witness's testimony or in determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [§] 702." Mass. G. Evid. § 701. See Commonwealth v. Grier, 490 Mass. 455, 476 (2022); Commonwealth v. Mason, 485 Mass. 520, 538 (2020). Where a witness is giving an opinion on the meaning of slang terms, in order for his testimony to be "rationally based" and "helpful"

to the jury, it must be established that the witness has sufficient familiarity with the slang terminology. And where the witness testifies to "his own personal understanding of what [the defendant] meant, developed in the context of face-to-face conversation," it is "not based on scientific, technical, or other specialized knowledge within the scope of [Mass. G. Evid. § 702]." United States v. Prange, 771 F.3d 17, 27, 29 (1st Cir. 2014), quoting Fed. R. Evid. 701(c).

Interpreting the nearly identical language of Fed. R. Evid. 701, Federal courts in the First Circuit have decided consistently that a coconspirator who worked as an undercover agent may provide lay opinion testimony explaining slang, jargon, or other coded language. See Mass. G. Evid. § 701 note; United States v. Santiago, 62 F.4th 639, 649-650 (1st Cir. 2023); United States v. Obiora, 910 F.3d 555, 561-562 (1st Cir. 2018), cert. denied, 139 S. Ct. 1586 (2019); United States v. Valbrun, 877 F.3d 440, 443-444 (1st Cir. 2017). If properly supported, such testimony need not be limited to the typical meaning of particular words but may extend more broadly to interpreting statements made by the defendant. See Santiago, supra at 649, quoting Obiora, supra at 562 ("no reason to require [a cooperating witness] to parse his interpretative testimony word by word as if he were a foreign language dictionary rather than an interpreter of a conversation").

Here, the testimony at issue is Cruz's interpretations of statements made by the defendant. The evidence at trial established that Cruz had been a drug dealer; that this was his "world"; that he had prior convictions of distribution of a class B substance; that he was twenty-seven years old at the time of trial and had known and become friendly with the defendant since Cruz was twelve or thirteen years old; that he had known Jeffreys, Mitchell, and Lacombe since at least 2008 and had been friendly with them; and most importantly, that Cruz had been part of Supreme Team. Not only had Cruz been a part of this team, but he also had been involved directly in the escalating feud between Supreme Team and Monteiro. In sum, the testimony sufficed to establish that Cruz would have knowledge of the slang terms used by this specific criminal enterprise.

The conversations between the defendant and Cruz were permeated with slang and code words. Such coded language was used to evade prosecution, as the defendant criticized Cruz more than once for "dropping bombs," that is, for using real names during conversations. The slang interpreted by Cruz ranged from highly specific to more general terms. A few examples will suffice. Cruz informed the jury that the members of Supreme Team referred to guns in code as "jackets," that "wrapped" meant to have a gun, and that "pop" meant to shoot. He testified about drug terminology, stating that "custies" were drug

customers and that "the works" referred to drugs. Most importantly, Cruz testified that the defendant's reference to "doing one" person was admitting his belief that he had killed the victim.

Because the evidence showed that Cruz would have knowledge of such terms, his testimony explaining the slang terms used by the defendant was admissible. Moreover, the risk of prejudice was minimized. The vigorous cross-examination of Cruz, described infra, placed the jury well on notice that they might question the credibility of Cruz's testimony, including his interpretations of the defendant's statements. Cf. Mason, 485 Mass. at 539. Indeed, the jury did not convict the defendant of conspiracy to murder Kathleen Soule, a charge that depended in no small part upon Cruz's explanations of conversations with the defendant. The trial judge also gave multiple contemporaneous instructions that except for inquiry about slang terms, the evidence at issue was the recorded statements themselves and only insofar as they were made or adopted by the defendant. And defense counsel used the slang testimony to support the defendant's theory of the case. Cross-examining Cruz, defense counsel specifically elicited testimony about the slang terms used by the defendant. In closing argument, he argued that the defendant's use of slang showed that he was merely a "wannabe" who liked to talk big. In sum, Cruz's testimony explaining the

defendant's slang was admissible because the foundation for his knowledge was sufficiently established in the record, the statements he interpreted were ambiguous, and the risk of prejudice was minimized.

4. Bad act evidence. The defendant further challenges evidence of a series of bad acts that he contends should not have been heard by the jury. Again, determinations of evidentiary "admissibility, probative value, and unfair prejudice are left to the sound discretion of the trial judge[] and will not be overturned absent clear error" (citation omitted). Melendez, 490 Mass. at 662.

"Evidence of a defendant's . . . bad acts is not admissible to demonstrate the defendant's bad character or propensity to commit the crime charged." Commonwealth v. West, 487 Mass. 794, 805 (2021). See Commonwealth v. Helfant, 398 Mass. 214, 224 (1986); Mass. G. Evid. § 404(b)(1). "Such evidence may be admissible, however, if relevant for another purpose, such as to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" Commonwealth v. Teixeira, 486 Mass. 617, 626 (2021), quoting Mass. G. Evid. § 404(b)(2). See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). "It also may be used where evidence of . . . bad acts is inextricably intertwined with the description of events . . . of the killing." Commonwealth v. Bryant, 482

Mass. 731, 734 (2019), quoting Commonwealth v. Marrero, 427 Mass. 65, 67 (1998). Put another way, "the prosecution is entitled to present as full a picture as possible of the events surrounding the incident itself" (quotation, citation, and alteration omitted). Commonwealth v. Morgan, 460 Mass. 277, 289 (2011).

But "[e]ven where relevant for a permissible purpose, the evidence is admissible only if its probative value is not outweighed by its prejudicial effect." West, 487 Mass. at 805. See Crayton, 470 Mass. at 249 n.27.[14] To be sufficiently probative, there must be a logical connection between the bad act and the facts of the case, and the bad act must not be too remote in time when viewed in light of that logical connection. See Teixeira, 486 Mass. at 627; West, supra; Commonwealth v. Facella, 478 Mass. 393, 405 (2017).

First, the defendant challenges testimony regarding a gun recovered on January 5, 2010. Evidence that the defendant possessed a gun is admissible to show that he had the "means of

---

[14] The defendant's trial took place before our decision in Crayton, 470 Mass. at 249 n.27, which clarified that evidence of other bad acts is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk. The trial judge here did not abuse his discretion under either standard, so we "need not decide whether the new standard we articulated in [Crayton] applies retroactively" (citation omitted). Commonwealth v. Da Lin Huang, 489 Mass. 162, 174 n.23 (2022), quoting Commonwealth v. Andre, 484 Mass. 403, 414 n.21 (2020).

committing the crime," including "access to or knowledge of firearms." Commonwealth v. Holley, 478 Mass. 508, 532, 533 (2017), quoting Commonwealth v. McGee, 467 Mass. 141, 156, 157 (2014). See Mason, 485 Mass. at 533; Commonwealth v. Watt, 484 Mass. 742, 749-750 (2020). To admit such evidence, it is not necessary to submit direct proof that the gun at issue was used in the commission of the charged offense. See Holley, supra at 533. Rather, it is sufficient that the gun "was just one possible model of gun that 'could have been used in the course of a crime.'" Id., quoting McGee, supra at 156. For example, in Watt, supra at 749, we held that where a black .40 caliber firearm was used in a shooting, "testimony that the defendants previously had been seen with a 'Glock,' a '40,' and a black firearm was properly admitted to demonstrate that the defendants had access to the type of firearm that was used."

Here, the evidence indicated that the loaded black .40 caliber Glock handgun recovered on January 5, 2010, belonged to the defendant, and it had the same caliber and general type of rifling as one of the guns used in the earlier shooting of the victim. Therefore, testimony about its recovery was admissible for the purpose of showing the defendant's access to such a firearm.[15]

---

[15] We additionally note testimony from Christine Davis that, in around 2007, she saw the defendant with a black gun on his

Second, the defendant takes issue with the admission of testimony regarding two other shootings:  a shooting at about midnight on May 17, 2009, on Whittenton Street; and a July 17, 2009, shooting on Maple Street.  Testimony regarding these shootings was admissible for the permissible purpose of establishing motive.  See Teixeira, 486 Mass. at 628; Watt, 484 Mass. at 748.  In Teixeira, supra, testimony about an earlier shooting established the defendant's motive because it revealed animus toward the target, whose brother was killed in the later shooting.  In Watt, supra, testimony about an earlier shooting was admissible to establish motive where the evidence indicated that the victim was murdered in retaliation for that earlier shooting.  And just as in this case, the motive at issue in Teixeira and Watt was animus based on a long-standing hostility between two groups.  See Teixeira, supra at 631; Watt, supra at 746-748.

Here, the Commonwealth's theory of the case was that the murder was motivated by the ongoing, violent dispute between

---

lap, as well as testimony from Jessica Deshler that she saw the defendant twice after January 2010 with a gun.  Due to the lack of detail, this testimony comes much closer to impermissible evidence of a person's general acquaintance with weapons.  See Commonwealth v. Watt, 484 Mass. 742, 749-750 (2020); Commonwealth v. Vazquez, 478 Mass. 443, 448-449 (2017).  Even so, these guns could have been used in the shooting, and so we conclude that it was within the trial judge's discretion to admit this testimony, and there was no clear error in doing so. See Watt, supra; Vazquez, supra.

Supreme Team and Monteiro.  The defendant admitted to Cruz that the shooting on Whittenton Street was an earlier attempt by Supreme Team to shoot at Monteiro.  And testimony established another later gunfight between the defendant and Monteiro, which the jury could have concluded occurred on July 17, 2009, in the Maple Street area.  These other shootings illustrated Supreme Team's hostility toward Monteiro and established the motivation of its members for shooting at his vehicle.

Testimony regarding these incidents also spoke to the defendant's state of mind and intent.  See Commonwealth v. Pagan, 440 Mass. 84, 87-88 (2003) ("Evidence that the defendant attempted to fire a deadly weapon at [the victim] just ten days prior to the actual killing is probative of the defendant's hostile attitude toward [the victim], his intent to kill [the victim], and the premeditated nature of the later killing").  And ultimately, the question here was whether the defendant intended to participate in a murder.  The defendant's theory of the case was that he was not a full-fledged member of the Supreme Team criminal enterprise but simply a "wannabe."  His participation in attempts to kill Monteiro earlier on the very night in question and then again some months later provided a powerful and permissible rebuttal to this argument.[16]

_____

[16] The defendant takes further issue with recordings of intercepted telephone calls between the defendant and Jeffreys

Third, the defendant challenges the admission of certain acts that broadly might be classed as evidence of gang involvement. Specifically, the defendant contests the admission of testimony about his driving many different vehicles, his involvement in drug sales, his tattoos, and his display of gang signs. But if gang affiliation is the motive for a murder, then "[e]vidence of gang affiliation [i]s relevant to the defendant's motive and state of mind." Commonwealth v. Maldonado, 429 Mass. 502, 504 (1999). See Commonwealth v. Swafford, 441 Mass. 329, 332-333 (2004). Such evidence is particularly appropriate for establishing joint venture liability where, as here, the defendant denies that he participated in the murder with the requisite intent. See Commonwealth v. Lopes, 478 Mass. 593, 604 (2018); Commonwealth v. Akara, 465 Mass. 245, 268 (2013) ("We have most often allowed gang evidence to be admitted for the purpose of establishing joint venture in cases where the evidence showed that the offense involved retaliation or conflict between rival gang members . . . and that the defendants therefore shared a common motive").

---

in July 2010 because they suggested a continuing conspiracy to kill Monteiro. For the reasons described supra, establishing the existence of such a conspiracy was a permissible purpose for the admission of bad act evidence. See Teixeira, 486 Mass. at 628; Watt, 484 Mass. at 748; Pagan, 440 Mass. at 87-88.

Here, there was testimony that after the victim's death, the defendant and two other members of Supreme Team got tattoos stating "death before dishonor" and, further, that one of those other members had that same motto displayed in his vehicle. This message suggests a joint venture, and therefore the testimony was admitted for the appropriate purposes of showing motive, intention, and state of mind. See Akara, 465 Mass. at 268-269 (common symbols suggesting participants are "one for all and all for one" are relevant to joint venture). See also Lopes, 478 Mass. at 604.

The defendant also disputes the admission of photographs in which he "appear[ed] to flash gang signs." But the trial judge did not discern any such signs, and a review of these exhibits does not show this conclusion to be erroneous. Rather, the photographs at issue were offered for the permissible purpose of showing the defendant's association with Supreme Team, including the defendant and Jeffreys each wearing a medallion with the initials "S" and "T" on it. As described supra, such common symbols are relevant to establishing a joint venture theory, so these materials were properly admitted. See Lopes, 478 Mass. at 604; Akara, 465 Mass. at 268-269.[17]

---

[17] Testimony that the defendant recruited a witness to work as an exotic dancer was properly admitted for the same purpose of showing joint venture, that is, motive, because members of

As to each of these acts, the prejudicial impact of any evidence suggesting gang involvement was ameliorated to some extent by the Commonwealth's agreement not to refer explicitly to Supreme Team as a gang during the course of the trial.

Fourth, the defendant challenges evidence that he was a drug dealer[18] and evidence of his acquisition and possession of guns, including guns obtained from a drug customer.  Again, where guns might have been used to commit the offense, their possession by the defendant is admissible.  See Holley, 478 Mass. at 533.  And "evidence of the defendant's activity as a drug dealer" is admissible to establish motive.  See Bryant, 482 Mass. at 735-736.  What is more, the prosecution is entitled to present a full picture of the alleged crime to the jury.  See Morgan, 460 Mass. at 289.

---

Supreme Team were in the business of promoting such dancers. See Lopes, 478 Mass. at 604; Akara, 465 Mass. at 268-269.

[18] The defendant challenges testimony that he drove many different vehicles as improper bad act evidence.  It is not clear that driving different vehicles by itself speaks to a person's character, see Mass. G. Evid. § 404(b)(1), but we read the defendant's argument to mean that in combination with other evidence, this testimony suggested that he was a drug dealer. Here, however, there was eyewitness testimony that the defendant sold cocaine, and such testimony necessarily outweighed any potential inference from driving multiple vehicles. Consequently, we analyze the more important issue of drug dealing testimony.  See Watt, 484 Mass. at 747-748 (finding erroneously admitted testimony harmless where cumulative of admissible testimony).

The evidence at issue established that the defendant and Lacombe coordinated the illegal purchase of a .45 caliber semiautomatic handgun, three .40 caliber semiautomatic handguns, and a nine millimeter semiautomatic handgun by a drug customer, Leigh Baker, who then transported them across State lines.  The defendant and Lacombe then gave Baker money and cocaine in exchange for the illegally purchased firearms.  For his part, the defendant sought to make this an ongoing arrangement, telling Baker that "at any point . . . if [he] had extra firearms, or if [he] came across firearms, . . . [the defendant] would be willing to purchase them."  Consistent with that understanding, the defendant also paid Baker for a sixth illegally purchased .40 caliber semiautomatic handgun.

Moreover, Cruz testified that the defendant was known to possess a .45 caliber firearm along with "all types" of other guns, including .45 caliber, .40 caliber, .380 caliber, and .38 caliber firearms.  Cruz further recounted the defendant's statement that "we" had a number of guns from which to choose, including .40 caliber guns and other types of guns not used in the shooting at issue.  As to the .45 and .40 caliber guns, this testimony was permissible for the reasons described supra.  See Holley, 478 Mass. at 533; Commonwealth v. Vazquez, 478 Mass. 443, 448-449 (2017).  As to the other guns, the testimony suggested that they were held collectively by Supreme Team, and

the jury could have concluded that some of those guns had been obtained by the defendant through drug customers.

The defendant's acquisition of guns from Baker showed how he obtained the guns that might have been used in the shooting. The fact that the defendant was acquiring guns for collective use by Supreme Team showed his motivation and intentions with regard to the violence that Supreme Team employed in its feud with Monteiro, violence that culminated in the murder of the victim. See Mitchell, 468 Mass. at 418-419, 427; Akara, 465 Mass. at 268-269. Relatedly, this evidence answered the defendant's argument that he was not a full participant in the criminal enterprise that was Supreme Team. In closing, defense counsel argued that the defendant was "nothing but a big talker. He's on the team, but he's a bat boy. He's not a clean-up hitter. That's the difference. . . . [T]his kid does nothing but talk smack, is nothing but a wannabe." This evidence showed otherwise.

For his part, the trial judge mitigated the prejudice of such evidence through individual voir dire and specific instructions to the jury. He also screened each potential juror for bias that might arise from testimony about illegal firearms. See Maldonado, 429 Mass. at 505. And the judge provided cautionary instructions against the misuse of bad act evidence. To remedy any prejudice caused by erroneously admitted bad act

evidence, "the judge ordinarily may rely on curative instructions." Commonwealth v. Roe, 90 Mass. App. Ct. 801, 804 (2016). See Maldonado, supra. Conversely, "failure to guide the jury" on the limited purposes for which they may consider such evidence can amount to prejudicial error. See Roe, supra at 807.

Here, the trial judge specifically instructed jurors not to infer any culpability from bad acts. Quoting from Mass. G. Evid. § 404(b)(2), he provided a contemporaneous instruction not to consider the evidence of other shootings for any purpose other than "motive, opportunity, intent, preparation, plan, knowledge, identity, nature of relationship, or absence of mistake or accident." At the close of the case, the judge again instructed the jury against using evidence of other shootings, drug dealing, or illegal firearm transactions for any impermissible purpose. He forbade the jury to consider any of this as evidence of propensity or bad character and instructed the jury only to consider such evidence for the permissible purposes listed in the Massachusetts Guide to Evidence, which he again quoted, and he also added that the evidence might be considered for relevance to a common plan or scheme. In sum, the judge took steps to minimize the prejudicial impact of the evidence, and we presume that the jury followed the judge's instructions. See Bryant, 482 Mass. at 737.

The judge's quotation from the Massachusetts Guide to Evidence correctly summarized the law. Even so, we note that instead of specifying the precise purposes for each piece of bad act evidence admitted, the judge's limiting instructions simply listed every permissible purpose written in § 404(b)(2). We caution that bad act evidence is "inherently prejudicial," and where the jury are allowed to consider such evidence for purposes not in dispute, the risk of improper use can be "enormous." Crayton, 470 Mass. at 249 n.27, 251. Therefore, it generally is insufficient guidance for a trial judge simply to provide a collective list of bad act evidence and then instruct on every possible permissible purpose, as was done here.[19] See Commonwealth v. Samia, 492 Mass. 135, 148 n.8 (2023). In this instance, however, the risk sufficiently was mitigated by the instruction given because the bad act evidence was relevant for multiple permissible purposes, and further, the bad acts at

---

[19] We continue to stress that it is incumbent on counsel proffering bad act evidence to specify the precise nonpropensity purposes for which it is offered. See Commonwealth v. Samia, 492 Mass. 135, 148 n.8 (2023). To the extent such evidence is admitted, it is the responsibility of a trial judge to "articulate the precise manner in which the [bad act evidence] is relevant" to the case, that is, to the specific nonpropensity purposes for which it is admitted. Id., quoting Andre, 484 Mass. at 415. Further, a trial judge must "consider and articulate" on the record the risk that the jury will nevertheless use the evidence for an impermissible propensity purpose. Samia, supra. See Andre, supra.

issue spoke to some extent to the other factors listed in § 404(b)(2).

5. Pretrial and postconviction discovery. The sufficiency of pretrial and postconviction discovery also is disputed. Specifically, the defendant points to certain items produced in postconviction discovery, including late postconviction discovery that was produced in October 2022, during the pendency of these proceedings, and he argues that these materials[20] should have been produced prior to trial. Counsel for the defendant would have used these items for three purposes: (1) to show that the secret recordings of the defendant were obtained in violation of G. L. c. 272, § 99; (2) to establish that the 2010

_____

[20] As to pretrial materials, the defendant claims not to have received certain video recordings of witness interviews, although this is disputed, and he takes issue with evidence disclosed midtrial that Cruz was shot in 2011. The discovery produced in response to the order allowing the motion for postconviction discovery purportedly amounted to over 600 pages of documents. From these, the defendant's arguments focused on certain prosecutor's notes, a letter from Cruz demanding further benefits from the Commonwealth in exchange for his testimony, e-mail messages describing benefits for Cruz, and a police report describing an arrest of Cruz. The defendant also represented that the late postconviction materials amounted to more than 500 pages, and he selected a portion that he requested be added to the record in this case. But the defendant now has the benefit of all these materials, and as described infra, he does not use them to advance any argument that shows prejudice or requires a new trial. See Commonwealth v. Barry, 481 Mass. 388, 399-400, cert. denied, 140 S. Ct. 51 (2019); Mass. R. Crim. P. 30 (b), (c) (3), as appearing in 435 Mass. 1501 (2001).

drug charges and instant murder charges were "inextricably intertwined"; and (3) to better impugn the credibility of Cruz.

These first two arguments were made before this court with the benefit of the materials at issue, and for the reasons described <u>supra</u>, we disagree. As to the third, trial counsel's "spirited" cross-examination of Cruz so thoroughly attacked his credibility that these additional materials only would have been cumulative. The cross-examination established that Cruz was a drug dealer and career criminal who cooperated with the Commonwealth only for his own benefit and that, otherwise, he readily lied to law enforcement when it suited him, including about the feud between Supreme Team and Monteiro.

The cross-examination also emphasized the benefits, valued at $16,139, that Cruz received from the Commonwealth, which benefits included the posting of bail, the removal of certain default warrants, and the provision of housing, food, and money, including payment for two classes that Cruz's girlfriend needed to take. It was also clear that Cruz expected future benefits, including that a further warrant or charge would be resolved in his favor immediately after his trial testimony. Given the thoroughness of the cross-examination on these topics, further testimony on these points merely would have been cumulative.

Because the postconviction materials at issue only would have been used in support of unpersuasive arguments or else as

cumulative testimony, the failure to produce them prior to trial did not prejudice the defendant and does not warrant an evidentiary hearing or a new trial, and the motion judge did not abuse his discretion in denying the defendant's motions for a new trial and for an evidentiary hearing on this ground. See Commonwealth v. Barry, 481 Mass. 388, 399-400, cert. denied, 140 S. Ct. 51 (2019); Mass. R. Crim. P. 30 (b), (c) (3), as appearing in 435 Mass. 1501 (2001).

6. Motion for further discovery. The defendant also appeals from the denial of his motion for further discovery, which sought the production of materials subject to the work product protection or else an order requiring the Commonwealth to produce the equivalent of a privilege log. The defendant seeks this discovery to argue that there was no organized crime connection sufficient to authorize Cruz's secret recordings of the defendant. Because there is no requirement that the Commonwealth disclose such materials, see Mass. R. Crim. P. 14 (a) (5), as appearing in 442 Mass. 1518 (2004); Commonwealth v. Bing Sial Liang, 434 Mass. 131, 137-138 (2001), and because the defendant's argument consists only of speculation regarding a supposed effort to mislead the trial judge about the South Carolina dispute, an argument that we considered and addressed supra, the motion judge did not abuse his discretion in denying the defendant's motion for further discovery.

7.  CSLI evidence.  The defendant contests the admissibility of evidence regarding cell site location information (CSLI) from the cell phones of Jeffreys and the defendant.  Specifically, certain CSLI records were admitted in evidence in this case, and testimony from a radio frequency engineer was admitted explaining the import of those records.  The trial in this case occurred prior to this court's decision in Commonwealth v. Augustine, 467 Mass. 230, 232, 255 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015), in which we held that CSLI is subject to the warrant requirements of art. 14.  Moreover, the defendant concedes that the relevant objection to this evidence was not made before or during trial.  Consequently, to the extent that the evidence was admitted improperly, we review for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Broom, 474 Mass. 486, 492-493 (2016).

Here, even if the evidence were admitted improperly, there was no substantial likelihood of a miscarriage of justice because the CSLI records "were both cumulative and corroborative of other evidence."  Vazquez, 478 Mass. at 446.  See Commonwealth v. Gumkowski, 487 Mass. 314, 322-323 (2021).  Although the CSLI and related testimony were consistent with the Commonwealth's theory of the case, they were merely cumulative

and corroborative of Cruz's testimony, which placed the defendant at the scene.

Specifically, the CSLI and related testimony placed the defendant in the general area of the shooting around the time it occurred.  And they showed that the defendant maintained cell phone contact with Jeffreys during the night of the shooting and traveled in the same direction, actions that suggest an intention to participate.  But the CSLI evidence was not precise enough to place the defendant at the scene of the shooting.  Indeed, defense counsel emphasized the CSLI evidence in his closing argument, concluding that it was consistent with the defendant's being on the farther side of the Taunton River and choosing to remain at a distance.  Through cross-examination, defense counsel suggested that cell phone calls between the defendant and Jeffreys showed that they were not together.

In sum, the CSLI was only cumulative and corroborative of Cruz's stronger testimony that placed the defendant at the scene of the shooting.  See Gumkowski, 487 Mass. at 322-323; Vazquez, 478 Mass. at 446-447.  Given the force of the defendant's admissions to which Cruz testified, "we are substantially confident that the jury's verdict would not have been any

different had the CSLI records not been admitted." Vazquez,
supra at 447.[21]

8.  Court room closure.  The Commonwealth sought to exclude
Jeffreys's brother, John Jeffreys, from attending the trial on
the basis of his alleged role in conspiring to kill a witness.
It was represented to the trial judge that John Jeffreys had
been indicted for his role in that conspiracy.  Even so, the
judge initially denied the Commonwealth's motion without
prejudice.  During trial, however, the Commonwealth renewed its
motion, and the judge barred John Jeffreys from the court room.
Shortly thereafter, the judge reconsidered, vacated his order,
and permitted him to return.  John Jeffreys was excluded from
the court room on the foregoing basis for approximately five
minutes.

The defendant contends that this exclusion violated his
right to a public trial, as secured by the Sixth Amendment to
the United States Constitution.  See Commonwealth v. Cohen (No.
1), 456 Mass. 94, 106 (2010).  But a de minimis closure, that
is, one which "is so limited in scope or duration that it is not
constitutionally relevant," is reviewed only for abuse of

_____

[21] As this conclusion applies to the challenged CSLI
evidence from both the defendant's and Jeffreys's cell phones,
we need not reach the Commonwealth's argument that the defendant
lacked standing to challenge the CSLI evidence from Jeffreys's
cell phone.

discretion.  See Vazquez Diaz v. Commonwealth, 487 Mass. 336, 352 (2021); Cohen (No. 1), supra at 108-109.  Here, a single spectator, John Jeffreys, was barred from the court room for five minutes, during which time Christine Davis gave testimony that did not relate directly to the shooting at issue but to certain slang terms and prior bad acts.  Given the security concerns[22] presented to the judge and the extremely limited nature of the exclusion, the judge did not abuse his discretion.  See Commonwealth v. Fernandes, 478 Mass. 725, 733 (2018) ("Deference is owed to a trial judge's perception of the dangers of threats and intimidation in the court room").[23]

9.  Third-party culprit.  The defendant claims that the judge excluded certain third-party culprit evidence when he sustained an objection to the following question posed to a

---

[22] We note also that concerns were raised later in the trial regarding instances of possible witness intimidation in and out of the court room.  Moreover, later testimony indicated that John Jeffreys was present for and may have participated in Jeffreys's intimidation of a grand jury witness.  These later developments showed that court room security was a concern in this case.

[23] Similarly, during a pretrial motion session, the court room was closed for the brief duration of argument regarding the Commonwealth's initial motion to exclude John Jeffreys from the court room during trial.  For the same reasons described supra, including its extremely short duration and the security concerns raised, as well as the judge's finding that the conference would otherwise have been held at sidebar outside the hearing of spectators, the closure was de minimis and did not amount to an abuse of discretion.  See Vazquez Diaz, 487 Mass. at 352; Fernandes, 478 Mass. at 733.

witness:  "You also heard that . . . Cruz was possibly involved;
isn't that true?"  "A defendant has a constitutional right to
present evidence that another may have committed the crime," and
so "we afford 'wide latitude' to such evidence" (citations
omitted).  Commonwealth v. Alcantara, 471 Mass. 550, 559 (2015).
Even so, the evidence must not be "too remote or speculative"
(citation omitted).  Id. at 559-560.  Although otherwise
impermissible hearsay is admissible for establishing a third-
party culprit defense, it only is admissible "in the judge's
discretion" if it is "otherwise relevant, [it] will not tend to
prejudice or confuse the jury," and where there are "substantial
connecting links" to the crime (citation omitted).  Id. at 559.
Unsubstantiated rumor may be excluded properly without violating
the defendant's constitutional right to present third-party
culprit evidence.  See Martinez, 487 Mass. at 269-270;
Alcantara, supra at 559-560.

    We review such constitutional questions de novo.  See
Martinez, 487 Mass. at 267.  Here, the defendant sought to
introduce a mere rumor.  In attempting to build foundation,
defense counsel's prior question showed only that the witness
had "heard a lot of things" about the victim's murder.  And when
pressed at sidebar about the question at issue, defense counsel
explained that he sought to know what the witness had heard
about what Cruz was saying "around town."  The answer therefore

properly was excluded, and we note that the judge nevertheless permitted defense counsel to ask the witness less speculative questions on the same topic. Moreover, defense counsel was otherwise permitted to explore this theory. When cross-examining Cruz, he elicited that Cruz wanted to kill Monteiro himself, and he suggested that Cruz lied about not being present for the shooting. Further, counsel elicited from an investigating trooper that police received information that Cruz had a problem with Monteiro.

10. Admission of certain business records. Records from two businesses, a gun shop and a moving vehicle rental company, were admitted in evidence without objection from trial counsel. On appeal, the defendant asserts that the admission of these records created a substantial likelihood of a miscarriage of justice because they were admitted improperly. See Upton, 484 Mass. at 159-160. The defendant does not explain how their admission created such a likelihood.

The rental company records were used to identify the defendant's telephone number, but they were cumulative of the CSLI records, which displayed the defendant's name along with his telephone number. A witness who recognized the defendant's telephone number testified to it, and to the extent he did not remember the number but for the records, they could have been used to refresh his memory. See Commonwealth v. Cheng Sun, 490

Mass. 196, 214 (2022). The records were only cumulative or corroborative of other evidence. See Vazquez, 478 Mass. at 446. Moreover, the defense did not dispute the defendant's telephone number but rather used the CSLI records to advance its own theory of the case that the defendant was a "wannabe" and only followed Jeffreys at a distance. There was no substantial likelihood of a miscarriage of justice.

The defendant takes issue with the records from the gun shop, which corroborated Baker's testimony about purchasing guns from that store. But the defendant did not dispute directly that Baker purchased these guns. Rather, he disputed that Baker sold the guns to the defendant. There was no substantial likelihood of a miscarriage of justice because there was no indication that the records at issue were inconsistent with the defendant's theory of the case. See Commonwealth v. Taylor, 455 Mass. 372, 377-378 (2009).

11. Closing argument. During closing argument, the prosecutor discussed testimony given by a witness from the Department of Transportation. Specifically, the witness testified that a 2009 study revealed that on a Sunday morning from 1 A.M. to 2 A.M., 184 vehicles traveled in the southbound lanes of Route 24, where the shooting occurred. In closing, the prosecutor argued that "180 cars go by during that hour," continuing, "You take that and divide it by sixty minutes, three

cars go by an hour.  And guess what three cars were there?
Statistically speaking . . . ."  From the context, he intended
to say "minute" instead of "hour."  This conclusion was offered
in support of the prosecutor's argument that traffic was sparse
on that stretch of highway at the time of the shooting.

The defense argues that these representations created a
substantial likelihood of a miscarriage of justice.  See Upton,
484 Mass. at 159-160.  But the defendant did not dispute that a
crime occurred on that road in the early morning hours.  Rather,
he only disputed that he was present; the amount of traffic was
not a point of contention.  Even if we assume that the
prosecutor was suggesting that his math compelled the presence
of a third vehicle -- a plainly impermissible inference from the
testimony under discussion -- it did not follow that the vehicle
needed to be the defendant's.  In the end, the prosecutor's
argument on this point was inaccurate, but it did not reach the
issue in dispute because it did not connect the defendant to the
scene.  Contrast Commonwealth v. Ferreira, 460 Mass. 781, 788
(2011) (incorrect statistical argument supported "the lone
eyewitness identification on which the prosecutor's case wholly
rested").  Moreover, the judge instructed the jury repeatedly
that nothing in closing arguments constituted evidence.  See
Commonwealth v. Cosme, 410 Mass. 746, 753 (1991).  For these

reasons, there was no substantial likelihood of a miscarriage of justice.

12. Ineffective assistance of counsel. The defendant argues that he received ineffective assistance from his trial counsel insofar as counsel (a) failed to review the contents of the video recordings described in the May 14, 2020, and October 23, 2020, affidavits of trial counsel, (b) failed to object to CSLI evidence, and (c) failed to object to the admission of documents from the gun shop and rental company. Where, as here, we conduct a plenary review of the defendant's conviction of murder in the first degree, we evaluate his claim of ineffective assistance of counsel under the more favorable standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice. See Commonwealth v. Denson, 489 Mass. 138, 150-151 (2022). Even if trial counsel did not review the video recordings in question, this error was not likely to have influenced the jury's conclusions for the reasons described supra in addressing these materials along with other pretrial and postconviction discovery. And as demonstrated, there was no error in counsel's decisions not to object to the CSLI and the records from the gun shop and rental company, as this material only established points that were not disputed by the defendant. In fact, the CSLI evidence was used by the defendant to promote his theory of the case.

13. Comments regarding defense expert. We also note that, during closing argument, the prosecutor referred to the defendant's handwriting expert as a "buffoon," and some of the cross-examination of this expert approached improper insinuation insofar as it seemed to suggest that the expert's testimony was bought by the defendant. As the defendant did not object, we review the questions and argument for a substantial likelihood of a miscarriage of justice. Commonwealth v. Rutherford, 476 Mass. 639, 643-644 (2017). We do not believe that the testimony of the defense expert had substantial weight except to suggest to the jury that they might question Cruz's assertions about the defendant's participation in a conspiracy to murder Soule. Ultimately, the jury found the defendant not guilty of this charge, and consequently, there was no substantial likelihood of a miscarriage of justice.

14. Duplicative convictions. The parties agree that the defendant's three convictions of assault by means of a dangerous weapon pursuant to G. L. c. 265, § 15B (b), are duplicative of his three convictions of armed assault with intent to murder pursuant to G. L. c. 265, § 18 (b), because the former crime is a lesser included offense of the latter. See Commonwealth v. Parenti, 14 Mass. App. Ct. 696, 703 (1982). "The appropriate remedy," therefore, "is to vacate both the conviction[s] and sentence[s] on the lesser included offense[s], and to affirm the

conviction[s] on the more serious offense[s]."  Commonwealth v. Mello, 420 Mass. 375, 398 (1995).  Consequently, we vacate the defendant's three convictions of assault by means of a dangerous weapon.  See Commonwealth v. Quiles, 488 Mass. 298, 318 (2021), cert. denied, 142 S. Ct. 1237 (2022).

15.  Review under G. L. c. 278, § 33E.  We have reviewed the record in accordance with G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial.

Conclusion.  For the foregoing reasons, we affirm the defendant's convictions except for his three convictions of assault by means of a dangerous weapon pursuant to G. L. c. 265, § 15B (b), which we vacate as duplicative, and we affirm the denial of the defendant's motions for a new trial, for an evidentiary hearing, and for further discovery.

So ordered.